[L.A. No. 31201. July 3, 1980.]

SIGNAL COMPANIES, INC., et al., Plaintiffs and Appellants, v.
HARBOR INSURANCE COMPANY, Defendant and Respondent.

360

**COUNSEL**

Brewster L. Arms, William J. Currer, Jr., and Richard T. Kayaian for Plaintiffs and Appellants.

Morris & Polich, Landon Morris, John K. Morris, Robert S. Wolfe and Herbert S. Brumer for Defendant and Respondent.

Gibson, Dunn & Crutcher, John L. Endicott, Robert A. Miller, Hancock, Rothert & Bunshoft, Harlow P. Rothert, LaBrum & Doak,

Edward C. German, Michael D. Gallagher, Lewis, D'Amato, Brisbois & Bisgaard, Robert F. Lewis and M. Patricia Marrison as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**RICHARDSON, J.**—Plaintiff, Pacific Indemnity Company (Pacific), a primary liability insurer, appeals from a judgment which relieved defendant Harbor Insurance Company (Harbor), an excess insurer, from any contribution for the costs of defense incurred on behalf of an insured of the parties. The issue presented is the proper allocation between insurance carriers of defense costs incurred in defending the insured when the amount of settlement of the underlying tort claim exceeds the limits of primary insurance coverage thus requiring some contribution by the excess insurer. We will affirm the trial court's judgment which, under the circumstances, imposed the defense costs on Pacific, the primary carrier.

The Signal Companies and Signal Oil and Gas Company (Signal) purchased a policy of public liability insurance from Pacific. The policy, in effect from October 1, 1962, through September 30, 1965, provided that, for an annual premium of approximately $106,000, Pacific would afford primary insurance for liability for specified types of bodily injury and property damage to a limit of $25,000. Under the policy Pacific agreed that it would defend Signal in any civil actions against Signal arising under the insured risks, and would also pay defense costs in addition to the "applicable limit of liability" of the policy.

Shortly thereafter, Signal purchased from Harbor "Excess Bodily Injury and Property Damages" insurance. The Harbor policy provided that its excess coverage of $10 million would not attach until either the primary insurer had admitted liability or Signal had been adjudged liable and the full primary exposure had been paid and satisfied. The Harbor policy further recited that it was subject to the same terms and conditions as the primary policy "except as regards...the obligation to investigate and defend." Defining "costs" as "understood to mean interest accruing after entry of judgment, investigation, adjustment, and legal expenses," Harbor's agreement further provided that if a claim or claims appeared likely to exceed the primary limits, Signal was required

to obtain Harbor's written consent before incurring costs. In the event that the settlement of any claim against the insured exceeded the limits of the primary policy, Harbor agreed, if it had consented *"to the proceedings continuing,"* to contribute a pro rata share of the defense costs based upon the proportion which its contribution bore to the ultimate settlement by, or judgment against, its insured.

On December 13, 1963, in the City of Los Angeles (City), the Baldwin Hills reservoir and dam collapsed. City and its Department of Water and Power (DWP) settled the individual claims of property owners arising from the disaster. City and DWP then filed two civil actions, one as subrogors of the individual claimants, the other on their own behalf, seeking approximately $25 million in damages resulting from the dam and reservoir failure. Signal was one of numerous oil companies which were named as defendants in the first amended complaint alleging that soil subsidence induced by subterranean oil well digging structurally weakened the dam. In 1967 service of the complaint was effected on Signal which thereupon forwarded copies of the complaint to its carriers, Pacific and Harbor.

Pacific, as the primary insurer, arranged for and provided Signal's defense. The entire litigation against all defendants ultimately was settled in 1971 for approximately $3 million, of which $35,000 was contributed on behalf of Signal. Pacific paid its policy limits of $25,000 and Harbor contributed $10,000.

At all times during the pendency of the litigation, the attorney representing Signal on behalf of Pacific, William Currer, asserted that Signal was not liable to any plaintiff because of the distance of the Signal wells from the dam, and he so informed Harbor. Nonetheless, on February 4, 1970, Attorney Currer, on behalf of Signal, sent a telegram to Harbor which read in part: "This case may now be adjustable for a sum in excess of primary coverage. . . . We want to know how much in excess of the primary coverage you are willing to pay to adjust this claim. Otherwise proceedings must continue and Signal Oil and Gas Company will consider that you have consented to contribute to the cost including attorney fees and expert witnesses for the proceedings about to commence."

The telegram was followed by a telephone conversation between Attorney Currer and John Callaghan, Harbor's claims manager, in which Currer suggested to Callaghan that Signal contribute $30,000 to a pro-

posed settlement with the plaintiffs. Callaghan promptly agreed that Harbor would contribute $5,000 of that amount. Currer then wrote to Callaghan, under date of February 6, 1970, confirming Harbor's agreement to contribute, and asserting for the first time that Pacific believed that Harbor had an equitable duty to contribute to defense costs "in the proportion which the primary limits bear to the excess limits." In a responding letter on February 10, 1970, Callaghan rejected Currer's assertion that Harbor was required to contribute to the defense costs. Callaghan noted that Harbor possessed no information which pointed to Signal's possible liability, and requested that Currer furnish Callaghan with certain information on the case. Currer replied by stating that he believed that plaintiffs' case against Signal was very weak and that Signal might be dismissed from the suit upon motion after plaintiffs rested, and possibly after opening statements. A few days later, Currer advised Harbor that the case could be settled for $35,000 from Signal, which would require a $10,000 contribution from Harbor. Harbor again promptly agreed to pay $10,000, and the litigation against Signal was settled for $35,000.

Thereafter, Pacific renewed its demand that Harbor contribute to the $95,000 legal expenses incurred by Pacific for Signal's defense. Harbor refused and this action followed. Signal, although a nominal plaintiff, had incurred no defense expenses and therefore, as noted by the trial court, had no basis for recovery. The litigation thereafter proceeded between the affected insurance carriers alone.

The trial court ruled that Harbor was not obligated to contribute to the defense expenses. The court reasoned that under the express terms of Harbor's excess policy, Harbor was obligated to pay defense costs if the claim was settled for a sum in excess of the primary limits provided that Harbor had agreed to a "continuation of the proceedings." Because Harbor had promptly agreed to contribute the amounts necessary on its part to settle the case, the court found that there was no "continuation" of the proceedings, thus absolving Harbor under the terms of its policy.

The court further concluded that the two policies could not be construed as one contract, and that Signal had no particular expectation as to which of its two insurers would provide a defense—only that a defense would be provided. Finally, the trial court rejected Pacific's contention that the principles announced in *Aetna Cas. & Surety Co. v. Certain Underwriters* (1976) 56 Cal.App.3d 791 [129 Cal.Rptr. 47], were controlling.

Upon reviewing Pacific's various contentions, we agree with the trial court's conclusion that Harbor was not obligated to contribute to the defense costs which were incurred by Pacific before Pacific's coverage was exhausted and before notification to Harbor that its participation in defending the action was desired.

We dispose of a preliminary question, namely, once a carrier (in this instance, Pacific) has paid its full policy limits has it thereby exhausted its obligation to defend its insured? There is disagreement among the authorities. (14 Couch on Insurance (2d ed. 1965) § 51:49 at pp. 542-543 and cases cited therein.) This issue, however, is presented to us only marginally because in the matter before us the exhaustion of primary coverage and the settlement of all claims occurred simultaneously.

Recently, in *Transit Casualty Co.* v. *Spink Corp.* (1979) 94 Cal. App.3d 124 [156 Cal.Rptr. 360] (disapproved in part in *Commercial Union Assurance Cos.* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912 [164 Cal.Rptr. 709, 610 P.2d 1038]) Justice Paras summarized very well, within the context of an action alleging a wrongful refusal to settle, the relationship between excess and primary coverages: "The policyholder pays for two kinds of liability coverage, each at a different rate. The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier. It takes into account costs of defense, including legal fees, which the primary insurer normally provides. The excess carrier is less frequently confronted with loss possibilities and, when it is, may employ local adjusters. The primary insurer is assisted, not impeded, by the active participation of another carrier with a stake in the negotiations. Self-interest will impel the primary carrier to take the lead when settlement value is well within its policy limits, the excess carrier when the claim invades its own policy exposure. When settlement value hovers over the fringes of both policies, both carriers may collaborate." (94 Cal.App.3d at p. 135.) Even if the carriers do not collaborate, as we recently noted in *Commercial Union, supra,* the primary carrier, in settling an action, owes a duty of good faith to the excess carrier based on the theory of equitable subrogation. (26 Cal.3d at pp. 917-918.)

In the case at bench the trial court refused to impose on Harbor any obligation to contribute to defense costs because no such costs were incurred following the settlement, and Pacific's primary duty to defend did not terminate until settlement. Pacific has conceded that, except for

insubstantial amounts, all of the defense costs for which it seeks Harbor's contribution were incurred prior to Currer's request that Harbor contribute to the settlement and costs of defense. Pacific responds, however, that once the excess insurer has been given notice that the tort claim against its insured might invade the excess coverage, and the amount of potential exposure is reasonably ascertainable, the excess insurer should be obligated to participate immediately in the defense, either directly with the claimant or, indirectly, by contribution to the primary carrier.

The acceptance of Pacific's position, however, essentially would make Harbor a coinsurer with Pacific with a coextensive duty to defend Signal. Pacific relies on *Aetna Cas. & Surety Co.* v. *Certain Underwriters, supra*, in arguing that Harbor had a coextensive duty to defend Signal because Signal's potential liability was in excess of the combined coverage afforded by both insurers. *Aetna* is clearly distinguishable, however. In that case, Union Oil Company (Union) had three insurance policies. Aetna Casualty and Surety Company (Aetna) provided primary coverage up to $50,000, and Harbor and Lloyds of London (Lloyds) each extended coverage for 50 percent of any excess loss to a limit of $475,000. Lloyds provided an additional $21 million of excess coverage. When a substantial property loss occurred due to a mishap involving a Union oil well located in the Santa Barbara Channel, Aetna undertook Union's defense and paid its $50,000 primary coverage in settlement of various individual claims. Before exhausting its full limits of liability, Aetna advised Harbor and Lloyds that once its policy limits were paid, its duty to defend would thereupon terminate and Harbor and Lloyds would be required to assume that duty. The excess carriers refused to defend, and Aetna, reserving its right to deny liability for any further defense, continued its representation. Thereafter, Harbor paid its full policy limits and Lloyds paid more than $800,000 in claims.

Harbor and Lloyds, in denying their obligations to defend relied on language similar to that contained in the Harbor policy before us which provided that their obligation to investigate and defend differed from that of the primary carrier. Harbor and Lloyds each contended that there was no explicit obligation to defend. The Court of Appeal nonetheless found that the excess insurers had an implied duty to defend because their policies did not expressly exclude or deny such a duty. Additionally, the *Aetna* court held that "appellants [Harbor and Lloyds] as insurers have a coexisting and coequal obligation to defend

as representatives and on behalf of the insured Union, with reference to all of the *excess* claims." (*Aetna*, supra, 56 Cal.App.3d at p. 801, italics added.) The court further held that *"under the facts at bench* after the payment of the $50,000 of primary coverage, the primary carrier Aetna had no further duty to provide a defense without the right of reimbursement from the excess carriers. The amount of reimbursement is dependent upon facts relative to the total amount paid by all carriers, the proportion of each insurer's payment to the total, all properly determinable by the trial court." (*Id.*, at p. 804, italics added.)

Although Aetna involved costs of defense when the primary carrier had clearly exhausted its policy limits and the proceedings continued, Pacific would apply the *Aetna* holding to require the excess carrier to participate in the defense of the insured as soon as it is notified of the claim, and even though the primary insurance coverage has not as yet been exhausted.

The foregoing result urged by Pacific is untenable for several reasons. First, Harbor's policy explicitly states that its liability would not attach until the primary coverage has been exhausted. Next, the same policy provides that the duty to contribute to costs would arise only if Signal obtained Harbor's written consent to incur costs which Signal neither sought nor obtained. Additionally, unlike the situation in *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], relied on by Pacific, it is unnecessary to impose an immediate duty to defend on the excess carrier to afford the insured that to which it is entitled, namely, the full protection of a defense on its behalf. In *Gray*, we held that where "the potential of liability under the policy" exists, an insurer is obligated to defend because the duty to defend and the duty to indemnify were obligations under the policy and the duty to defend was not contingent on the ultimate duty to indemnify. (*Id.*, at pp. 276-277; see also *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]; *Continental Cas. Co. v. Zurich Ins. Co.* (1961) 57 Cal.2d 27 [17 Cal.Rptr. 12, 366 P.2d 455]; *Lowell v. Maryland Casualty Co.* (1966) 65 Cal.2d 298 [54 Cal. Rptr. 116, 419 P.2d 180].) Unlike the situation in *Gray*, insofar as the duty to defend is concerned, the insured here was fully protected by the primary insurer.

Finally, Pacific's fundamental contention would require Harbor to contribute to the defense costs incurred by the primary carrier even

though excess liability might never attach and despite the explicit provisions of Harbor's policy. This would be contrary to that line of cases which hold that where there is excess coverage, whether by virtue of an excess clause in one policy or otherwise, it is the primary insurer which is solely liable for the costs of defense if the judgment does not exceed primary coverage. (See, e.g., *National American Ins. Co. v. Insurance Co. of North America* (1977) 74 Cal.App.3d 565, 576 [140 Cal.Rptr. 828], and cases cited therein; *Universal Underwriters Ins. Co. v. Aetna Ins. Co.* (1967) 249 Cal.App.2d 144, 152 [57 Cal.Rptr. 240].) These cases have held generally that even though the *claim* against the insured may be for a sum in excess of the primary coverage, the primary insurer is obligated to provide a defense and may not seek contribution from the excess carrier even though its successful settlement or defense relieves the excess insurer from indemnifying the injured party. (*Ibid.*)

Pacific further argues that because the excess coverage was ultimately invaded for purposes of settlement, Harbor was required to contribute to the defense costs. Pacific relies on *Continental Cas. Co. v. Zurich Ins. Co., supra*, wherein we held that "all obligated carriers who have refused to defend should be required to share in costs of the insured's defense, whether such costs were originally paid by the insured himself or by fewer than all of the carriers." (57 Cal.2d at p. 37.)

*Continental* presented significant factual dissimilarities, including three separate insureds and three separate policies, each providing primary coverage with a primary obligation to defend. The insurance companies, relying on various clauses in their respective policies requiring either that proration occur in the event of other coverage or that coverage would be deemed excess in the event of other primary coverage, each disputed which company was obligated to indemnify and defend. The insured defendant in the underlying tort action demanded a defense from all three companies. After determining the relative duties to indemnify and which companies were primary and which excess, we then held that the three companies were liable for defense costs on a pro rata basis determined by the amount of contribution to the judgment against the insured.

None of the *Continental* carriers was solely or explicitly an excess insurer. Each provided primary coverage with a concomitant duty to defend upon which the insured was entitled to rely. (See *Gray, supra.*) In addition, each of the carriers in *Continental* was tendered the de-

fense and two of the three refused to participate after the tender. The insured potentially could have been left without a defense.

Unlike the situation in *Continental*, where the relative obligations of different carriers who have assumed the same primary risk must be adjusted, we are here concerned with the obligation of a carrier that is expressly designated as an excess insurer. In such a situation there is no reasonable basis for assuming that the reasonable expectations of either the insured or the primary carrier were that the excess carrier would participate in defense costs beyond the express terms of its policy.

We expressly decline to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers. (Cf. *Gray, supra,* 65 Cal.2d at pp. 276-277.) ■ Moreover, we affirm the wisdom expressed in *Amer. Auto. Ins. Co.* v. *Seaboard Surety Co.* (1957) 155 Cal.App.2d 192, 195-196 [318 P.2d 84]: "The reciprocal rights and duties of several insurers who have covered the same event do not arise out of contract, for their agreements are not with each other. . . . Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers their application is not controlled by the language of their contracts with the respective policy holders." (See also *National American Ins. Co.* v. *Insurance Co. of North America, supra,* 74 Cal.App.3d at p. 577.)

■ To impose an obligation on Harbor to reimburse Pacific in contravention of the provisions of its policy could only be justified, however, by some compelling equitable consideration. We find no such consideration here. Before seeking Harbor's contribution to the settlement, Pacific acted in all respects for its own benefit. The defense costs at issue were incurred by Pacific in the performance of its contractual obligation to its insured to afford a defense. The expenses were incurred almost entirely prior both to settlement of the litigation and exhaustion of Pacific's policy coverage. As we have noted, Pacific bore the primary obligation to defend and to protect both its insured and, through subrogation principles, the excess carrier from excess liability. (*Commercial Union, supra.*)

When the opportunity was presented to settle the tort claims against the insured and Pacific informed Harbor of that fact, the two carriers were then acting at arms' length. Attorney Currer, Pacific's counsel acting for Signal, consistently took the position that Signal's liability was extremely doubtful. Had Harbor at that time refused to contribute to settlement, Pacific potentially could have incurred substantial additional costs in the expected two- to three-month trial. Harbor did not refuse to contribute, however, but instead promptly facilitated settlement by contributing $10,000. If, under these circumstances, Pacific intended at the time of demand for a settlement contribution to impose an additional obligation on Harbor to contribute also to defense costs as part of the overall settlement, Pacific should have obtained Harbor's agreement to such contribution as part of the settlement. Because it did not do so, no equitable basis appears for shifting to Harbor costs which Pacific had previously incurred primarily on its own behalf, in discharge of its own contractual obligations.

■ Finally, we reject Pacific's contention that the two insurance contracts should be read together as one instrument. Pacific argues that such a construction benefits the insured both by providing a single system for the handling of the defense and defense costs incurred on Signal's behalf, and requiring that the primary and excess carrier share the costs of defense.

In support of this argument Pacific relies on section 1642 of the Civil Code which in aid of contractual interpretation provides "Several contracts relating to the same matters, *between the same parties*, and made as parts of substantially one transaction, are to be taken together." (Italics added.) However, Pacific's argument ignores a basic prerequisite to unified interpretation, namely, that the parties to the contracts must be the same. This, of course, is untrue in the matter before us. Furthermore, nothing in the Pacific contract made it contingent upon, or required the existence of, excess coverage and nothing in the Harbor contract made it dependent upon the existence of the specific contract between Pacific and Signal, although *a* primary policy was required. The contracts were separately negotiated with the insured with different dates of inception and termination. We conclude that the two documents are separate contracts and must be independently interpreted.

■ In summary, Signal was protected by Pacific's duty to defend. We cannot conclude that Signal reasonably expected that Harbor

would be required to contribute to the costs of defense or to provide a defense prior to the exhaustion of Pacific's policy limits. Nor can we conclude that Pacific was entitled to expect Harbor to contribute to Signal's defense in the absence of a prior demand for Harbor's assistance in the defense and without Harbor's written consent to the costs incurred as provided in the Harbor policy. Although an excess carrier, once a good faith request is made, might in a given case be required to contribute to the continuing costs of defense after the primary coverage limits are exhausted, we cannot say, under the facts at bench, that Harbor breached any duty to defend. Having fulfilled its own contractual obligation to provide Signal a defense, Pacific is not entitled to Harbor's contribution to Pacific's costs incurred in Signal's defense.

The judgment is affirmed.

Mosk, J., Clark, J., Manuel, J., and Newman, J., concurred.

**STANIFORTH, J.\*—**I dissent.

Harbor Insurance Company (Harbor) consented to Pacific Indemnity Company's (Pacific) pretrial settlement of a commonly insured loss claim made against The Signal Companies (Signal) for an amount $10,000 in excess of Pacific's (the primary insurer's) policy limits. By reason of these admitted facts and the explicit words of paragraph 2(b) of Conditions of its contract, Harbor was required to "contribute to the costs incurred" on behalf of its insured Signal "in the ratio that its proportion of the ultimate net loss as finally settled bears to the total agreed settlement."

## I

Harbor is the excess insurer. Its policy provides: *"Liability attaches to the Company...only after the primary...insurers have paid* or have been hald [*sic*] liable to pay the *full amount of their...ultimate net loss liability...."* (Endorsement No. 13, par. (A); italics added.) Concerning Harbor's contractual duty to defend Signal, its policy (par. 5, Conditions) recites it is subject to the same terms, warranties, conditions as the primary policy "(except...*as regards* the premium, *the obligation to investigate and defend*, the renewal agreement (if any), the amount and limits of liability..., and except as otherwise provided

---

*Assigned by the Chairperson of the Judicial Council.

herein) as are contained in or as may be added to the policy/ies of the Primary Insurers...." (Italics added.)

Harbor's undertaking as to costs[1] is found in paragraphs 1, 2, subdivisions (a) and (b) of Conditions: "1. Incurring of Costs. In the event of claim or claims arising which appear likely to exceed the Primary... Limit(s), no Costs shall be incurred by the Assured without the written consent of the Company.

"2. Apportionment of Costs. Costs incurred by or on behalf of the Assured with the written consent of the Company, and for which the Assured is not covered by the Primary...Insurers, shall be apportioned as follows:

"(a) Should any claim or claims become adjustable prior to the commencement of trial for not more than the Primary...Limit(s), then no Costs shall be payable by the Company.

"(b) *Should, however, the amount for which the said claim or claims may be so adjustable exceed the Primary...Limit(s), then the Company, if it consents to the proceedings continuing, shall contribute to the Costs incurred by or on behalf of the Assured in the ratio that its proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss.*" (Italics added.)

Pacific is the primary insurer. Under Coverage C (property liability), Pacific is obligated "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of the injury to or destruction of property, including the loss of use thereof" up to $25,000, the policy limit.

With respect to the obligation to defend, Pacific's policy (par. II) reads in part: "It is further agreed that *as respects insurance afforded by this policy the Company shall (a) defend in the Insured's name and behalf any suit against the Insured arising out of or alleging such destruction, and seeking damages on account thereof, even if such suit is groundless, false or fraudulent*; but the Company shall have the right to make such investigation, negotiation, and settlement of any claim or suit as may be deemed expedient by the Company;...." (Italics added.)

---

[1] "Costs" as defined in Harbor's policy "shall be understood to mean...*investigation, adjustment and legal expenses*...." (Italics added.)

In the context of these policy provisions certain conceded facts become critical: (1) The claim against Signal did not proceed to trial but "became adjustable" and was in fact settled before trial. (2) The "ultimate net loss liability" was $35,000, $10,000 in excess of Pacific's duty to indemnify. (3) Harbor expressly authorized Pacific's settlement proceedings that continued by the negotiations process to fruition. (4) In satisfying the first $25,000, Pacific "paid...the full amount...of their ultimate net loss liability." (5) Harbor paid $10,000 in discharge of its portion of the loss.

The trial court found, since the claim was settled for $10,000 in excess of the primary policy limits, that subdivision (2) of Conditions of Harbor's policy "applies to such situation." The court reasoned: "It provides for a contribution to the costs incurred where the claim can be settled in excess of the primary limit."

Thus the trial court correctly perceived the core of this contractual construction conundrum but fell into error when it concluded: "However this provision applies *only if the Company consents to the proceedings continuing*. The litigation did not proceed in the present case. Harbor promptly agreed to pay its $10,000 contribution as soon as it was determined that the case could be settled for $35,000. The case did not continue."

The precise language of the Harbor policy does not yield itself to such (mis)interpretation.

## II

Paragraph 2(b) of Conditions makes the primary insurer—Pacific—a third party beneficiary of the insurance contract between Harbor and Signal.

Civil Code section 1559 provides: "A contract, *made expressly for the benefit of a third person*, may be enforced by him at any time before the parties thereto rescind it." (Italics added.) It has long been the rule that principles of third party beneficiary contracts are applicable to policies of insurance. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943 [132 Cal.Rptr. 424, 553 P.2d 584]; *Bass* v. *John Hancock Mut. Life Ins. Co.* (1974) 10 Cal.3d 792, 796-797 [112 Cal.Rptr. 195, 518 P.2d 1147]; *Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 33 [147

Cal.Rptr. 655]; *Mutual Benefit Life Ins. Co. v. Clark* (1927) 81 Cal. App. 546, 554-555 [254 P. 306].) The third person need not be named or identified individually to be an "express beneficiary" but may enforce the contract if it can be shown it is a member of a class for whose benefit the contract was made. (*Johnson v. Holmes Tuttle Lincoln-Merc.* (1958) 160 Cal.App.2d 290, 297 [325 P.2d 193].)

While Pacific was not named specifically as the beneficiary of the undertaking by Harbor in paragraph 2(b), *supra*, yet Pacific was clearly a member of the class of beneficiaries contemplated. Pacific is the "primary insurer."

Although the contract was not made to benefit Pacific alone (the promises are made directly to Signal), it may enforce those promises made for its benefit. (*Murphy v. Allstate Ins. Co., supra*, 17 Cal.3d 937, 943; *Hartman Ranch Co. v. Associated Oil Co.* (1937) 10 Cal.2d 232, 245 [73 P.2d 1163]; *Johnson v. Holmes Tuttle Lincoln-Merc., supra*, 160 Cal.App.2d 290, 297.)

As a third party beneficiary, Pacific may enforce the contract not only as to the expressly delineated benefits (Civ. Code, § 1559; *Murphy v. Allstate Ins. Co., supra*, 17 Cal.3d 937, 943-944) but also in an appropriate case may enforce the implied covenants as well. (*Hartman Ranch Co. v. Associated Oil Co.* (1937) 10 Cal.2d 232, 242, 244-245 [73 P.2d 1163]; *Gilbert Financial Corp. v. Steel Form Contracting Co.* (1978) 82 Cal.App.3d 65, 69-70 [145 Cal.Rptr. 448].) The contracting parties' intent to benefit the third party controls as to both express as well as implied terms. (*Murphy v. Allstate Ins. Co., supra*, 17 Cal.3d 937, 943.)

### III

Paragraph 2(b) of Conditions is from a Harbor insurance policy "Form U 604E CFS (11-61)." The uncontradicted testimony indicates there were *no negotiations* regarding this critical language. These uncontradicted facts—a standardized form contract—accepted without negotiations by the insured, warrant the use of rules of interpretation applied to adhesion contracts. (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].) Yet such special rules for construction of contracts are not necessary in order to hold Harbor responsible on third party beneficiary principles. General rules

governing the construction of any and all contracts point to an explicit undertaking on the part of Harbor to apportion costs incurred by Pacific by a most specific formula.

No extrinsic evidence was offered or received as an aid of interpreting the critical provisions of Harbor's policy. Therefore an independent determination of their meaning is authorized. This judicial function is to be exercised in accordance with generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; see Civ. Code, §§ 1635-1661; Code Civ. Proc., §§ 1856-1866.)

The paramount rule governing the interpretation of contracts is to give effect to the mutual intention of the parties. That intent must, in the first instance, be derived from the language of the contract—we must look to the words themselves. (Civ. Code, § 1636; *French* v. *French* (1941) 70 Cal.App.2d 755, 757 [112 P.2d 235, 134 A.L.R. 366]; *Healy Tibbitts Constr. Co.* v. *Employers' Surplus Lines Ins. Co.* (1977) 72 Cal.App.3d 741, 748 [140 Cal.Rptr. 375, 97 A.L.R.3d 1258].) The language, if clear, explicit and if it does not invoke an absurdity, controls our interpretation. (Civ. Code, § 1638; *County of Marin* v. *Assessment Appeals Bd.* (1976) 64 Cal.App.3d 319, 325 [134 Cal.Rptr. 349]; *Davis* v. *Basalt Rock Co.* (1952) 114 Cal.App.2d 300, 303-304 [250 P.2d 254].)

Equally well settled is the rule that the contract must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolated portion (Civ. Code, § 1641; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 760 [128 P.2d 665]; *Stewart Title Co.* v. *Herbert* (1970) 6 Cal.App.3d 957, 963 [96 Cal.Rptr. 631]).

Also, where a contract is susceptible of two interpretations, the courts shall give it such a construction as will make it lawful, operative, definite, reasonable and capable of being carried into effect if it can be done without violating the intention of the parties (Civ. Code, §§ 1643, 3541; *Rodriguez* v. *Barnett* (1959) 52 Cal.2d 154, 160 [338 P.2d 907]).

And where an uncertainty cannot be removed by other accepted rules of construction, it must be interpreted most strongly against the party

preparing it. (Civ. Code, § 1654; *Masonite Corp. v. Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 8 [135 Cal.Rptr. 170].)

And last but not least, specific provisions of an agreement, if inconsistent, prevail over those that are general. (*McNeeley v. Claremont Management Co.* (1962) 210 Cal.App.2d 749, 753 [27 Cal.Rptr. 87]; *MacDonald & Kruse Inc. v. San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 421 [105 Cal.Rptr. 725].)

An analytic approach, in light of the foregoing rules discloses: Harbor's policy (par. 1, Conditions) treats generally with "Incurring of Costs" and proclaims if claims arise "which appear likely to exceed the primary. . .limits" then "no costs shall be incurred by assured [Signal] without the written consent of the Company."

Thus neither the general language of paragraph 5 of Conditions (*supra*) nor paragraph 1 of Conditions expressly exempts Harbor either from a duty of defense or responsibility for costs of defense when incurred by the primary insurer. There is no flat denial of responsibility for costs of investigation and defense but rather a conditioned recognition of a duty to defend and assumption of costs that may be gleaned from a none-too-clear "exculpating clause" an expression of a general intent to limit responsibility for costs except where express consent is given.

These general—and somewhat oblique—provisos must be read in connection with just perceptibly more specific language of paragraph 2 of Conditions where Harbor expressly agrees to an apportionment of costs in these words: "Costs incurred by or on behalf of the Assured with the written consent of the Company, and for which the Assured is not covered by the Primary and Underlying Excess Insurers, shall be apportioned as follows:"

Paragraph 2, if first analyzed apart from the following subdivisions 2(a) and (b), lends itself to this rational construction: *all* costs, not just costs arising from a claim "where it appears likely to exceed the primary. . .limits," will be *apportioned* (not fully *assumed* as in par. 1) (1) if incurred with the written consent of Harbor *and* (2) for which the assured is not protected by the primary policy.

Paragraphs 1 and 2 must be read in conjunction with the immediately following subdivisions 2(a) and 2(b). Each of the subdivisions contain

clear, specific, precise language, limited in time and scope of event(s) and to a specifically defined area of costs. Subdivisions (a) and (b) apply only to costs incur*red* in connection with a claim that "become[s] adjustable," i.e., capable of being *settled* by agreement "prior to commencement of trial." Thus subdivisions (a) and (b) are to be contrasted with paragraph 1's general applicability to payment of costs incurred *at any time* whether pre- or posttrial.

In further contradistinction, subdivision (a) clearly is limited to these precise factual situations where (1) the claim "become[s] adjustable" *before* trial and (2) the claim is settled for *less* than the primary coverage. "Then no costs shall be payable by the company."

But if the claim "become[s] adjustable," can be settled *pretrial* for an amount that *exceeds* the primary policy's dollar coverage, then Harbor makes this most specific undertaking in paragraph 2(b): "Should, however, the amount for which the said claim or claims may be so adjustable exceed the Primary and Underlying Excess Limit(s), *then the Company, if it consents to the proceedings continuing, shall contribute to the Costs incurred by or on behalf of the Assured in the ratio that its proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss.*" (Italics added.)

This is the most clear, specific, detailed undertaking to be found in these conditions. It must be contrasted with the opaque, general language of paragraphs 1 and 2 requiring the "written consent" of Harbor before any liability for costs generally would accrue. The words of paragraph 2(b) impose on Harbor—for the benefit of a named class of third party beneficiaries—an obligation to pay a specific proportion of "costs incur*red*" by the primary insurer on behalf of the insured "if it [Harbor] *consents to the proceeding.*"

It should be noted: No other condition is attached to this unqualified promise to share costs in this limited amount and specified factual circumstances. The requirement in the general language of paragraphs 1 and 2 for "written consent" as to costs to be incurred *prospectively* is glaringly absent in paragraph 2(b). The requirement of paragraph 2 that the costs "not be covered by the primary" insurance is also noticeably absent.

A common sense interpretation of these plain words points unerringly to a purposeful omission of the earlier "written consent" general precon-

dition to Harbor's cost liability. For *before any liability whatsoever in the context of a pretrial settlement of a claim for a sum greater than the primary coverage, Harbor must consent to the "proceedings continuing."* For Harbor to be required both to consent in writing before incurring (future) costs and to consent to the settlement proceedings continuing to fruition is to introduce a contradiction, an absurd meaning. Harbor, when it consents to the proceeding continuing in the fact context of 2(b), undertakes not a general obligation for costs as in paragraph 1 or a general apportionment of costs as in paragraph 2 but agrees to a specific formula for sharing costs with the third party primary insurer that is totally inconsistent with the exculpatory conditions expressed in paragraphs 1 and 2. These juxtaposed clauses present a classic example for application of the rule that specific provisions of an agreement, if inconsistent, prevail over those that are general.

Harbor was not bound by its *express* contract to give its consent to a pretrial settlement of the claim for a figure that exceeded the primary's coverage,[2] yet it did consent in the fact context of paragraph 2(b) and thereupon became expressly obligated not only for the excess over the $25,000 primary coverage limits but also for "costs incurred" in accord with its specific agreed upon pro rata formula.

As noted above, the trial court held paragraph 2(b) not applicable in that Harbor did not consent to the "proceeding continuing." Thus the trial court interpreted the term *"proceeding"* as the equivalent of *"case"* or *"litigation."* While in a general sense the words "proceeding" may have this meaning assigned, yet another rule of construction compels the conclusion that the *"proceedings"* referred to in the context of paragraph 2(b) are *settlement* proceedings—not the "case" or the "litigation" generally. The meaning of particular words must be viewed in their contractual context. The meaning is not to be determined by isolating the questioned words or by taking them out of context. (Civ. Code, § 1641; *Sunset Sec. Co.* v. *Coward McCann, Inc.* (1957) 47 Cal. 2d 907, 911 [306 P.2d 777].) It is patently clear that the subject matter of 2(a) and (b) is "adjustable claims," that is to say claims that can be disposed of by *settlement* proceedings (see Black's Law Dict. (4th ed. 1968) p. 64) not claims that are nonadjustable and thereby to continue in the litigation process. Clearly Harbor's intent was to refer to *settlement* proceedings.

---

[2]But see *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658-659 [328 P.2d 198, 68 A.L.R.3d 883], imposing an *implied* covenant of good faith upon an insurer to settle in an appropriate case.

Secondly, if the term "proceeding continuing" is ambiguous, then it is to be construed, resolved against the drafting party (Harbor). (Civ. Code, § 1654; *Thomas* v. *Hunt Mfg. Co.* (1954) 42 Cal.2d 734, 739 [269 P.2d 12]; *Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 8 [135 Cal.Rptr. 120].)

Third, if we give "proceeding" the meaning as did the trial court, an absurdity is created. An inoperative concept is imported into an otherwise reasonable interpretation.

Such interpretation destroys the entire sense and purpose of paragraphs 2(a) and (b). If we assume Harbor's intent was to require a consent to the litigation proceedings continuing, the whole concept of pretrial settlement of a claim for an amount in excess of the primary's liability coupled with a specific agreed upon sharing of costs upon such contingency becomes an absurd, unreasonable, a nonconformable provision.

Paragraphs 1 and 2 each provide that no costs shall be incurred without Harbor's written consent. In contrast paragraph 2(b) requires, *not a consent to costs being incurred, but a totally different species of consent. The required consent is to the proceedings continuing to a settlement approved by Harbor.* Such specific consent and approval to a settlement was required of, obtained from, Harbor. Harbor, in giving this species of consent—whether written or verbal 2(b) does not define —to those clear express conditions of settlement, pretrial in an amount in excess of the primary coverage—triggered its obligation to share the costs *incurred* in the agreed proportions.

The trial court in its analysis of paragraph 2(b) concluded that since the "case" did not continue—it being settled—Pacific incurred no other cost or expense after such settlement was effected.[3] This view of paragraph 2(b) overlooks the tense of the operative verb "*occurred.*" This use of the past tense refers plainly and explicitly to costs incurred in the past—before settlement—not to costs to be incurred in the future as in paragraphs 1 and 2.

To say that the undertaking to share *costs incurred* in the context of pretrial settlement negotiations terminating in success would apply only

---

[3] A settlement pretrial generally does not, did not here, contemplate the future expenditure of costs. The costs have been incurred in investigation, lawyer fees, etc., by the time settlement is effected. The only costs that usually occur after settlement is effected are in the drafting and exchange of releases, checks.

to costs incur*red after* the settlement is effected results in a nonsensical meaning. To apply such meaning to "costs incurred" if the *case*, the litigation, continues and is not settled, results in even greater assault upon reason and perhaps a cry of foul from Harbor. Any other meaning attached to "incurred" in its context results in a nonoperative clause disrupting the entire sense and meaning of paragraph 2(b).

The majority opinion effectively deletes paragraph 2(b) from the Conditions of Harbor's policy. In so doing, it ignores the duty "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted...." (Code Civ. Proc., § 1858; *Jensen v. Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 790 [345 P.2d 1]; *Estate of Townsend* (1963) 221 Cal.App.2d 25, 27 [34 Cal.Rptr. 275].)

The cases relied upon by the majority construe policy language which differs significantly from the policy provisions in the cases at bench—excepting only *Aetna Cas. & Surety Co. v. Certain Underwriters* (1976) 56 Cal.App.3d 791 [129 Cal.Rptr. 47], which affirms the obligation to apportion costs where the primary coverage is exhausted. Moreover, the factual context here is unique, absent from any authority cited by the majority, including *Aetna Cas. & Surety Co., supra.*

Research has disclosed but four cases interpreting apportionment of costs undertakings either identical or essentially similar to those here in issue. They are: *Aetna Cas. & Surety Co. v. Certain Underwriters, supra*, 56 Cal.App.3d 791; *National Union Ins. Co. v. Phoenix Assur. Co. of N.Y.* (D.C. 1973) 301 A.2d 222, 224; *St. Paul Fire & M. Ins. Co. v. Indemnity Ins. Co. of N.A.* (1960) 32 N.J. 17 [158 A.2d 825]; *Occidental F. & C. Co. v. Underwriters at Lloyd's, Lon.* (1974) 19 Ill.App. 3d 192 [311 N.E.2d 330].)[4] Three of these cases—*Aetna Cas. & Surety Co., National Union Ins. Co.* and *St. Paul Fire & M. Ins. Co.*— interpret the conditions here under scrutiny as creating a duty of defense and a duty to share costs on a pro rata basis after exhaustion of primary limits of coverage. In *National Union Ins. Co. v. Phoenix Assur. Co. of N.Y., supra*, 301 A.2d 222, 225, it was held: "By the terms of National Union's contract, it was bound to share in the costs of the defense where a claim exceeded the primary insurance. The contract provided:

---

[4]None of these cases involve the unique hand-in-glove relation between the conceded facts and the language of 2(b) as is found in the case at bench.

"1. *Payment of Costs.* Costs incurred by the insured personally, with the written consent of the Company, and for which the insured is not covered by the said Primary Insurers, shall be apportioned as follows:

".  .  .  .  .  .  .  .  .  .  .  .  .  .

"(c) Should, however, the sum for which the said claim or claims may be so adjustable exceed the Primary Limit or Limits, then the Company, if they consent to the proceedings continuing, shall contribute to the 'Costs' incurred by the Insured in the ratio that their proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss."

In *St. Paul Fire & M. Co.* v. *Indemnity Ins. Co. of N.A., supra,* 158 A.2d 825, 826, the policy "provides that defendant shall pay no costs if the claims are adjusted prior to trial for a sum not in excess of the retained limits; and even where the claims appear likely to exceed the retained limits, defendant shall not be obligated unless it first gives consent to incurring the charge. But if defendant consents to 'trial court proceedings continuing' and if the settlement or judgment exceeds the retained limits, then it agrees to contribute to the costs in the ratio that its proportion of liability bears to the whole amount of the settlement or judgment."

The Supreme Court of New Jersey stated: "We find defendant's policy clearly and unambiguously delineates its obligation to be precisely as found by the trial court." (*Id.,* at p. 827.) And the Supreme Court denied recovery upon the basis of a defense verdict on trial but stated: "'It is elementary that a written contract must be construed to carry out the intent of the parties thereto as expressed in the contract *as written.* [Italics in original] *Here the obligation was to contribute only where there was either a judgment or a settlement and there was neither.* It follows, since the Court may not rewrite the policy that there can be no recovery by St. Paul, either as subrogee or assignee of the Gas Company.'" (*Id.,* at p. 827; italics added.)

The third case, interpreting the exact conditions here under scrutiny —*Aetna Cas. & Surety Co.* v. *Certain Underwriters, supra,* 56 Cal. App.3d 791—found an implied duty to defend and prorate costs where the recovery, settlement exceeded the primary coverage. This case will be discussed at length in IV, *infra,* in connection with the equitable subrogation rules.

In *Occidental F. & C. Co.* v. *Underwriters at Lloyd's, Lon. supra*, 311 N.E.2d 330, in language not dissimilar to that in the Aetna Casualty and National Union policies, the Appellate Court of Illinois found no duty of defense—no duty to share in costs of defense unless the following conditions were met: (1) The costs were incurred by the insured personally; (2) The incurring of such costs was with the written consent of the excess carriers; and (3) Such costs were not covered by primary insurance. (*Id.*, at p. 335.)

Superficially, the *Occidental Fire* case would appear to support the majority view as to the meaning and interpretation of the apportionment of cost language of Harbor's contract; yet a careful examination into the geneology of the authorities relied upon by the Illinois Appellate Court demonstrates without a shadow of doubt its conclusions are based upon rules of law, judicial decisions long ago overturned, rejected by the California courts. The Illinois court expressly relies upon a covey of cases in which *Financial Indem. Co.* v. *Colonial Ins. Co.* (1955) 132 Cal.App.2d 207, 210 [281 P.2d 883], is oft (erroneously) cited as a viable example of California authority for the proposition that the duty to defend a particular lawsuit is personal to each insurer; the obligation is several, and an insurance carrier is not entitled to divide the duty to defend, nor to require contribution for defending from another carrier, without a specific contractual agreement to that effect.

This view was rejected, and *Financial Indem. Co.* v. *Colonial Ins. Co., supra*, was overruled by this court in *Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 37, 38 [17 Cal.Rptr. 12, 366 P.2d 455].

Secondly, the Illinois court refused (contrary to a host of Cal. decisions) to apply the doctrine of equitable subrogation, to compel a pro rata sharing of costs where both insurers share the same risk and the judgment exceeded the primary limit, stating: "The plain and simple answer to this contention is that they did not contract to do so and that they were paid only for that which they did contract to provide." (*Occidental F. & C. Co.* v. *Underwriters at Lloyd's, Lon. supra*, 311 N.E.2d 330, 335.)

This legal stance is again directly opposed to unquestioned California authority detailed in IV, *infra*.

Thus the *one* case that facially appears to support the majority's interpretation of the "Conditions" here under scrutiny is disclosed on

close inspection to be naught but a decision by a protagonist on one side of a legal issue wherein California courts have long ago adopted contrary views. The correctness of that decision depends upon legal premise heretofore found unacceptable in California courts. (See *General Ins. Co. v. Truck Ins. Exch.* (1966) 242 Cal.App.2d 419, 424-425 [51 Cal.Rptr. 462]; *Argonaut Ins. Co. v. Colonial Ins. Co.* (1977) 70 Cal. App.3d 608, 615 [138 Cal.Rptr. 855], for authorities and views contrary to the *Occidental F. & C. Co., supra*, premises; and see *Fireman's Fund Ins. Co. v. North Carolina Farm B.M.I. Co.* (1967) 269 N.C. 405 [152 S.E.2d 513, 518]; 7C Appleman, Insurance Law and Practice (1980 supp.) § 4691; *American F. & C. Co. v. Pennsylvania T. & F. M. Cas. Ins. Co.* (5th Cir. 1960) 280 F.2d 453, fn. 11, where out of state authorities pro and con on this issue are collected.)

Concerning *Occidental F. & C. Co., supra*, 7C Appleman, Insurance Law and Practice, section 4691, pages 276-278, is sharply critical, stating: "In some cases it is indicated that an insurer that incurs defense costs cannot recover them because there are no subrogation rights under the contract or because each insurer has an independent obligation to defend and the matter is exclusively between the insurer and its insured.

"These holdings are indefensible. The courts are ignoring realities and encouraging insurers who are not concerned with their obligations to their insureds in the hope that someone else will step into the breach. It also ignores the fact that excess and other insurers are third party beneficiaries under the basic contracts of insurance and should be able to recover, either under a theory of equitable subrogation, contracts or torts, any expenses incurred under the circumstances. Further, as a matter of public policy, courts should be demanding that insurers give prompt defense of claims to policyholders rather than to tolerate the shifting of responsibility with such impunity. And that is the position taken either by statute or by decision in many states." (Citing Cal. authority; fns. omitted.)

In sum, the only authority that even facially supports the interpretation and conclusion of the majority opinion is based upon authority and reasoning long ago expressly overruled, rejected by the California courts.

These foregoing reasons, authorities compel the conclusion that Harbor is bound by paragraph 2(b) to share costs with the third party

beneficiary in proportion to its contribution to the total ultimate settlement figure.

## IV

If we make the fanciful assumptions that paragraphs 1, 2(a) and (b), and 5 do not exist in the Harbor policy, or if the presence is conceded, that section 1559 of the Civil Code and the assembled host of statutory rules for construction of contracts have no applicability to the words Harbor chose to use, yet there would be a right of equitable subrogation in favor of Pacific.

Pacific's policy (par. 11) provides expressly for such rights: "(a) The Company shall be subrogated to all rights which the Insured may have against any person, co-partnership, corporation, estate, or other entity (except those covered by this policy) to the extent of any payments made by the Company under this policy, and the Insured shall execute all papers required to secure to the Company such rights; . . . ." Pacific's policy further provides "*as respect to insurance afforded by this policy Pacific will defend* in the insured's name and behalf any suit. . . even if such suit is groundless false or fraudulent. . . ." (Italics added.)

Harbor's policy (Conditions, par. 5, *supra*) is not *equally* clear as to any *general* assumption duty to defend. On the other hand the Harbor policy, at no level of expression, in language either precise or ambiguous, expressly rejects the duty to investigate and defend a claim against its insured on a covered risk.

Thus each policy when read separately clearly affords coverage in the stated amounts against the common loss. But when we search for Harbor's duty to defend, the "maintenance of primary insurance" clause of Harbor's policy forces an examination of its opponent. Thus the "circular riddle" begins which can be resolved only by a judicial refusal to allow competing clauses between insurers of the same loss to remove, by shift and avoidance draftsmenship to diminish or destroy the *insured's* reasonable expectation not only of coverage of risk but also good faith investigation and defense and settlement to the end that the insured not be faced with a judgment in excess of coverages.[5] This artful avoidance

---

[5]Such escape clauses are generally disfavored in California cases. (*Argonaut Ins. Co. v. Transport Indem. Co.* (1972) 6 Cal.3d 496, 508 [99 Cal.Rptr. 617, 492 P.2d 673].) Thus California authorities disagree with the "convoluted logic" used in the Illinois court (*Employers Reinsurance Corp. v. Mission Equities Corp.* (1977) 74 Cal.App.3d 826, 831, fn. 2 [141 Cal.Rptr. 727].)

draftsmenship and logic, employed by insurers against each other, if carried to an extreme and applied against the insured, leads to a conclusion that the latter, though protected by two policies, actually has none. Where the battle is sharply drawn between two or more insurers, the insured may be left helpless on the sidelines. (See *Graves* v. *Traders and General Insurance Company* (La.App. 1967) 200 So.2d 67, 77, affd. 252 La.709 [214 So.2d 116, 117-118]; *Federal Ins. Co.* v. *Atlantic National Ins. Co.* (1969) 25 N.Y.2d 71 [302 N.Y.S.2d 769, 771-772, 250 N.E.2d 193]; *Indiana Insurance Co.* v. *American Underwriters, Inc.* (1973) 26 Ind. 401 [304 N.E.2d 783, 787].) The doctrine of equitable subrogation precludes such an unconscionable result. (*Continental Cas.* v. *Zurich Ins. Co., supra,* 57 Cal.2d 27, 37.)

If the "subrogation" proviso (par. 11) of the Pacific policy does not preserve subrogation rights by "contractual" (conventional subrogation) means against Harbor, then an equitable right of subrogation accrues in favor of Pacific where it performs a duty on behalf of the insured owed by Harbor. (*Employers etc. Ins. Co.* v. *Pacific Indem. Co.* (1959) 167 Cal.App.2d 369, 376 [334 P.2d 658]; *Commercial Standard Ins. Co.* v. *American Emp. Ins. Co.* (6th Cir. 1954) 209 F.2d 60, 64; *United States Guarantee Co.* v. *Liberty Mut. Ins. Co.* (1943) 244 Wis. 317 [12 N.W. 2d 59, 61] Rest., Restitution, § 162.)

Rights of subrogation may grow out of a contract but need not depend for their existence upon the express grant of the contract as they are created by law to avoid injustice. "'As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.'" (*Caito* v. *United California Bank* (1978) 20 Cal.3d 694, 704 [144 Cal.Rptr. 751, 576 P.2d 466]; *Estate of Kemmerrer* (1953) 114 Cal.App.2d 810, 814 [251 P.2d 345, 35 A.L.R.2d 1393].)

The doctrine has been many times extended to multiple insurers of the same risk. As was stated in *Amer. Auto. Ins. Co.* v. *Seaboard Surety Co.* (1957) 155 Cal.App.2d 192, 195-196 [318 P.2d 84]: "The reciprocal rights and duties of several insurers who have covered the same event do not arise out of contract, for their agreements are not with each other. [Citations.] Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement be-

tween the insurers their application is not controlled by the language of their contracts with the respective policy holders."

The landmark case of *Continental Cas. Co.* v. *Zurich Ins. Co., supra*, 57 Cal.2d 27, applied equitable subrogation principles to require a sharing pro rata of costs of defense where *primary* coverage was provided by more than one insured. This court stated: "Under general principles of equitable subrogation, as well as pursuant to the rule of prime importance—that the policy is to be liberally construed to provide coverage to the insured—it is our view that all obligated carriers who have refused to defend should be required to share in costs of the insured's defense, whether such costs were originally paid by the insured himself or by fewer than all of the carriers." (*Id.*, at p. 37.)

Factually, *Continental Cas. Co.* involved coinsurers of the same loss —not excess versus the primary insurer. Yet the principles announced are broad enough to cover any sharing of defense costs where coverage of a loss is provided by more than one insurer. (*Id.*, at p. 36.)

This court reasoned: "Two opposing views appear in the cases where the insured, or an insurer who has faithfully performed, has sought contribution from an insurer who refused to provide a defense. On the one hand it has been held that 'where two companies insure the same risk and the policies provide for furnishing the insured with a defense, neither company can require contribution from the other for the expenses of the defense where one denies liability and refuses to defend....' [¶] "On the other hand there are courts which, with little if any discussion of the point, appear to have found no difficulty in ordering pro rata sharing of defense expenses where coverage is provided by more than one insurer. [Citations.] We find no roadblocks to such a result and we think that the considerations which lead to it are more persuasive than any reasons suggested to the contrary. In this connection we note that any services contemplated by the agreement to defend are not personal in the sense that the services of any specifically named individual would be personal. Rather, such services necessarily contemplate the employment by the company of competent licensed attorneys and other personnel who, from a practical standpoint, must be viewed as rendering services to the company and for its benefit and the benefit of other obligated insurers, as well as for the benefit of the insured." (*Continental Cas. Co.* v. *Zurich Ins. Co., supra*, 57 Cal.2d 27, 36-37.)

The *Continental Cas. Co.* court expressly disapproved of the views announced in *Pac. Indem. Co. v. Cal. State Auto Assn.* (1961) 190 Cal.App.2d 293 [12 Cal.Rptr. 20]; *Columbia Southern Chemical Corp. v. Manufacturers & Wholesalers Indem. Exch.* (1961) 190 Cal.App.2d 194 [11 Cal.Rptr. 762]; and *Financial Indem. Co. v. Colonial Ins. Co.* (1955) 132 Cal.App.2d 207 [281 P.2d 883]. Each of these overruled cases expressly held that the other or underlying or excess or secondary insurance carriers had no obligations absent a specific contract with the primary or first insurer or with the insured to contribute to or pay for the defense provided by the primary or first insurer assuming the defense.

Thus the general principle of equitable subrogation extends to recoupment, to a sharing of defense costs between two or more insurers of the same risk despite the absence of any express contractual obligation. This rule has been followed, applied to a variety of coinsurers of the same risk. (See *Northwestern Mutual Ins. Co. v. Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031, 1044-1045 [143 Cal.Rptr. 415] [excess v. primary]; *Aetna Cas. & Surety Co. v. Certain Underwriters, supra,* 56 Cal.App.2d 791 [primary v. excess]; *American Surety Co. v. State Farm Mut. Auto. Ins. Co.* (1966) 274 Minn. 81 [142 N.W.2d 304, 306] [primary v. excess]; *State Farm Mut. Auto. Ins. Co. v. Foundation R. Ins. Co.* (N.M. 1967) 431 P.2d 737, 741 [excess v. primary]; 16 Couch on Insurance (2d ed. 1966) § 62.53; 7C Appleman, Insurance Law and Practice, § 4691, pp. 271-278.)

The principles formulated in *Continental Cas. Co., supra,* and *Gray v. Zurich, supra,* were faithfully applied in *Aetna Cas. & Surety Co. v. Certain Underwriters,* 56 Cal.App.3d 791, where an action was brought by the primary insurer against the excess insurers seeking upon equitable subrogation principles recovery of a pro rata share of costs incurred and to be incurred in connection with a commonly insured loss—the Santa Barbara oil well blowout. The policy language involved was that of the Harbor Insurance Company—again the excess carrier—almost identical with that in issue here. The losses unquestionably exceeded the primary's limits.[6]

The Court of Appeal found no express provision in Harbor's policy required the excess insurer to defend the claims made under the policy,

---

[6]The pretrial settlement of claims fact matrix was not present in *Aetna;* therefore paragraph 2(b) of Harbor's policy had no application. In this particular, *Aetna* is not in point.

yet held the obligation would be implied where the monetary limits of the primary policy had been exhausted.[7] This particular conclusion by the *Aetna* court is but another way of stating the rule that where the provision is unclear or uncertain, and if the duty is reasonably to be expected by the insured, the obligation will be implied by law and included as part of the agreement of the insurance.[8] (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.3d 883].)

In *Aetna,* as here, the trial court concluded that the duty to defend only arose if Harbor's duty to indemnify arose. A similar contention was answered by this court in *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 271, where the identical argument was made by the primary carrier with regard to its duty to defend the insured. In rejecting such an argument, this court stated: "At the threshold we note that the nature of the obligation to defend is itself necessarily uncertain. [Fn. omitted.] Although insurers have often insisted that the duty arises only if the insurer is bound to indemnify the insured, this very contention creates a dilemma. No one can determine whether the third party suit does or does not fall within the indemnification coverage of the policy until that suit is resolved; in the instant case, the determination of whether the insured engaged in intentional, negligent or even wrongful conduct depended upon the judgment in the Jones suit, and, indeed, even after that judgment, no one could be positive whether it rested upon a finding of plaintiff's negligent or his intentional conduct. The carrier's obligation to indemnify inevitably will not be defined until the adjudication of the very action which it should have defended. Hence the policy contains its own seeds of uncertainty; the insurer has held out a promise that by its very nature is ambiguous." (*Id.,* at pp. 271-272.) Such circular argument, found unacceptable to this court in *Gray* v. *Zurich* in defining the scope of the primary insurer's duty to defend an insured, should be equally unacceptable in defining the scope of the excess insurer's duty to defend where the primary coverage is exhausted by an agreed-to pretrial settlement.

The concept that a carrier should share pro rata in expenses of providing the defense even without resort to any express contractual

[7]The *Aetna* court plowed new legal ground in California *when before judgment it shifted defense duties* to the excess carrier. That issue is not here.

[8]The *Aetna* decision has been sharply criticized in an article entitled *Allocation of the Duties of Defense Between Carriers Providing Coverage to the Same Insured* in the April 1980 Ins. Counsel J. at pages 224, 251-260. The legal authority for the criticism is the holding in *Occidental F. & C. Co.* v. *Underwriters at Lloyd's, Lon., supra,* 311 N.E.2d 330, discussed above.

provision is not new and has been followed without question in a host of California decisions: *Otter* v. *Géneral Ins. Co.* (1973) 34 Cal.App.3d 940, 954 [109 Cal.Rptr. 831]; *Oil Base, Inc.* v. *Transport Indem. Co.* (1956) 143 Cal.App.2d 453, 468-469 [299 P.2d 952]; *Continental Cas. Co.* v. *Zurich Ins. Co., supra,* 57 Cal.2d 27, 37; *Hartford Acc. & Indem. Co.* v. *Pacific Indem. Co.* (1967) 249 Cal.App.2d 432, 437 [57 Cal.Rptr. 492]; *Truck Ins. Exchange* v. *Torres* (1961) 193 Cal.App.2d 483, 489-490 [14 Cal.Rptr. 408]; *Amer. Auto. Ins. Co.* v. *Seaboard Surety Co.* (1957) 155 Cal.App.2d 192, 196 [318 P.2d 84]; *Pac. Indem. Co.* v. *Amer. Mut. Ins. Co.* (1972) 28 Cal.App.3d 983, 989 [105 Cal. Rptr. 295]; *Spott Electrical Co.* v. *Industrial Indemnity Co.* (1973) 30 Cal.App.3d 797, 802 [106 Cal.Rptr. 710].)

These are the unquestioned rules: Where the final loss figure —whether by judgment or by settlement—is within the primary coverage limits, no apportionment of costs is warranted. For example, in *Universal Underwriters Ins. Co.* v. *Aetna Ins. Co.* (1967) 249 Cal.App. 2d 144 [57 Cal.Rptr. 240], the Court of Appeal denied Aetna, the primary insurer, reimbursement for any of its costs incurred in defending a personal injury action before its settlement; further, the court obligated Aetna to pay the excess insurer for any of its defense costs, reasoning: "[T]he Aetna policy provided primary coverage and, *since the limits on the Aetna policy were higher than the amount of the loss,* the excess coverage in the Universal policy did not come into effect. Since Aetna provided primary coverage in an amount sufficient to cover the entire loss, it also was liable to pay all costs of defense including attorney fees. [Citations.]" (*Id.,* at p. 152; italics added.) (See also *National American Ins. Co.* v. *Insurance Co. of North America* (1977) 74 Cal.App.3d 565, 576-577 [140 Cal.Rptr. 828], and cases cited therein for the same rule.)

But a contrary rule is indicated where the primary coverage is exhausted. In *Travelers Ins. Co.* v. *Norwich Union Fire Ins. Soc.* (1963) 221 Cal.App.2d 150, 153-154 [34 Cal.Rptr. 406], the Travelers policy provided that its coverage should be excess with respect to a nonowned car. The court held: "The primary liability to indemnify is that of Norwich." (*Id.,* at p. 153.) The court then stated: "*If judgment in fact exceeds the Norwich limits, that company would be entitled to contribution from Travelers of defense costs in the same ratio that the two share in paying such judgment* [citation]. We could not determine, in this litigation, that the primary coverage will be inadequate. In view of

the likelihood that no judgment will ensue in the Chlemens action, practical considerations suggest that this hypothetical right of Norwich to contribution be reserved. If, however, the only loss is to be the cost of defense, we are satisfied that it should fall upon the primary coverage." (*Id.*, at pp. 153-154.) (To the same effect see also *Hellman* v. *Great American Ins. Co.* (1977) 66 Cal.App.3d 298, 305 [136 Cal.Rptr. 24], and cases cited.)

In *Am. Fid. Ins. Co.* v. *Emp. Mut. Cas. Co.* (1979) 3 Kan.App.2d 245 [593 P.2d 14], after a scholarly review of *California* judicial decisions treating with division of duty of defense and costs by multiple insurers of the same risk, the court concluded (at p. 23): "From the foregoing the following principles may be derived: "1. Where the same risk is covered by both primary and secondary insurance, the primary insurer has the primary duty to defend.

"2. Where the claim made is within the limits of the primary policy, and the primary insurer undertakes the defense, the secondary insurer is not required to defend.

"3. Where the claim is over the limits of the primary policy and only one insurer undertakes the defense, the primary insurer and the excess insurer will each be liable for a pro rata share of the costs of defense in proportion to the amount of the claim each is required to pay.

"This result does not absolve any carrier from a duty to defend, but places the primary burden on the carrier which has issued primary insurance. It also recognizes the equitable subrogation rights of an insurer which has, by fulfilling its own duty to defend, also fulfilled an obligation owed by another." (To the same effect see *Valentine* v. *Aetna Ins. Co.* (9th Cir. 1977) 564 F.2d 292, 296, again applying and interpreting Cal. law.)

Thus the claim made here was settled for an amount greater than the primary limits; therefore the condition of exhaustion of the primary policy limits was fulfilled. "'*Such condition is complied with when the insured proves that claims aggregating the full amount of the specific policy have been settled thereunder and full liability of the insurer discharged.*'" (*United States Fid. & Guaranty Co.* v. *Safeco Ins.* (Mo. App. 1977) 555 S.W.2d 848, 853; to the same effect see *St. Paul Fire*

*& M. Ins. Co.* v. *Indemnity Ins. Co. of N.A.* (1960) 32 N.J. 17 [158 A.2d 818, 826-827]; see also 7C Appleman, Insurance Law and Practice, § 4682, pp. 34, 36-37, § 4691, pp. 274-275.)

No roadblock, equitable, legal, logical or constructional precludes the application of equitable subrogation principles to require proration of costs in this case in accord with the Conditions paragraph 2(b) formula.

## V

In the landmark case of *Gray* v. *Zurich Ins. Co., supra,* 65 Cal.2d 263, this court adopted a far reaching, enlightened consumer-oriented approach to interpretation of ambiguous language of an insurance policy. "We test the meaning of the policy according to the insured's reasonable expectation of coverage. . . ." And the *Gray* court held (at p. 276) where the language of the policy would reasonably lead the insured to expect a defense, the carrier would not be exonerated.

This "reasonable expectation" doctrine has been uniformly followed and approved by this court in contexts of a variety of ex-contractually "implied" duties. (See *Harris* v. *Glen Falls Ins. Co.* (1972) 6 Cal.3d 699, 701-702 [100 Cal.Rptr. 133, 493 P.2d 1]; *Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 920-921 [109 Cal.Rptr. 473, 513 P.2d 353]; *Gyler* v. *Mission Ins. Co.* (1973) 10 Cal.3d 216, 219-220 [110 Cal.Rptr. 139, 514 P.2d 1219]; *State Farm Mut. Auto Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193, 201-203, 207-208 [110 Cal.Rptr. 1, 514 P.2d 953]; *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [157 Cal.Rptr. 482, 598 P.2d 452]; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920 [148 Cal.Rptr. 389, 582 P.2d 980]; *Murphy* v. *Allstate Ins. Co., supra,* 17 Cal.3d 937, 940-941.) Last but not least to recognize this principle is *Commercial Union Assurance Cos.* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918, 919 [164 Cal.Rptr. 709, 610 P.2d 1038].

This healthful principle is but one aspect of the carrier's obligations imposed by law to act fairly and in good faith in discharging its contractual responsibility to its insured. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 920.)

This case cannot be viewed merely as a contest between two insurers each trying to absolve itself, to shift or share the burden of defense in-

vestigation and costs. It is a contest in which every insured—when this court opts for a denial of an excess carrier's duty to share costs of defense where excess coverage is invaded by settlement—will have its reasonable expectations as to an adequate good faith defense diminished.

An insured's "reasonable" or "legitimate" "good faith" expectation is not to receive a pro forma, anemic or "sweetheart" defense of his case. The insured is in economic peril when the excess coverage is exhausted. The insured's reasonable expectation as to the defense tendered should be measured against the implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. (*Brown v. Superior Court* (1949) 34 Cal.2d 559, 563-564 [212 P.2d 878]; *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654, 659.) An insured should reasonably expect that the apportionment of costs of defense clauses of the excess contract should be construed, in the absence of a policy provision to the contrary "as not to diminish the protection of the ·insured." (16 Couch on Insurance (2d ed. 1966) § 62.55, p. 504, and cases cited.)

The majority opinion diminishes that legitimate expectation when it places the primary insurer in this untenable position. The duty to defend must necessarily encompass the providing of the same good faith defense whether the primary limits are "likely" or "not likely" to be exceeded—at least to judgment. If this duty is imposed without coupling it with equitable subrogation rights against the excess carrier when the judgment or settlement exceeds primary coverage, then the primary insurer is put to a Hobson's choice. Hard economic reality stares the primary insurer in the face in that it is in a competitive industry; it is a profit-seeking corporation with duties to shareholders; it is not an eleemosynary institution. As this court observed in *Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257, 263 [107 Cal.Rptr. 175, 507 P.2d 1383, 90 A.L.R.3d 1185]: "Fidelity [excess insurer] argues that even if it was under a duty to defend McGregor, its failure to do so was of no consequence, because Great American defended him, and he therefore was not prejudiced. Great American's policy, however, had a $10,000 limit, and a defense by an insurer whose policy has a limit far below the amount claimed cannot be equated to the defense of an insurer who stands to lose 10 times as much as the insurer who defends." The insured's reasonable expectations are that the insurance company,

whether primary or excess, will provide the type of defense where the insured and the insurer's interests, objectives are compatible, not contrajuxtaposed.

The claims here made exceeded the combined primary and excess coverages. Signal's defense was a denial of any liability for the 1963 Baldwin Hills dam failure. While the primary and excess insurer boldly proclaimed nonliability, yet Pacific spent nearly $100,000 in investigation and defense costs to give substance to the stance taken. Whether upon trial a judgment would have been obtained against Signal for more than the insurance coverage is any person's guess. But if the claim is viewed not from hindsight, then the *insured's* reasonable expectations are to receive such quality defense as to preclude a judgment exceeding the combined policy limits thereby exposing the insured to personal liability. In short, the insured's reasonable expectation of a first class defense is not just limited to the first $25,000 of loss incurred.

Secondly, the majority opinion has chosen sides in a skirmish that is but part of a larger and longstanding "unfortunate and unnecessary conflict between certain primary insurers and excess insurers." (Lanzone, *Resolving Conflicts Between Primary and Excess Insurers* (1975) 635 Ins. L.J. 733, 739.) The specific policy provision here in issue— Harbor's "Form U 604E CFS (11-61)"—is reflective of the Jarndyce and Jarndyce specie of marathon negotiations between certain excess and primary carriers over the duties of defense of commonly covered losses that has been in process at least a generation and more. By each ell or cubit a carrier's (whether primary or excess) duty to defend has been diminished in this economically motivated debate, so also has the insured—a nonparticipant in these discussions—had its reasonable expectations of a full and adequate defense reduced.

The majority opinion represents more than just a retreat from economically salubrious principles. In following, sub silentio, the harsh inequitable holding of *Occidental F. & Cas. Co.* v. *Underwriters at Lloyd's, Lon. supra*, 311 N.E.2d 330, this court has turned back the clock, revived cases and doctrines rejected long ago. This decision constitutes an abandonment of the great principles enunciated in the California trilogy of insurance interpretation cases: *Gray v. Zurich Insurance Co., supra*, 65 Cal.2d 263; *Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31 [307 P.2d 359]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423 [296 P.2d 801, 57

A.L.R.2d 914], and a taking of sides in an insurance policy draftsmenship battle where inevitably, the ultimate loser is the nonrepresented insurance buying public.

I would reverse the trial court's judgment with direction to apportion costs in accord with the formula expressed in paragraph 2(b) of Conditions of Harbor's policy.

Bird, C. J., concurred.

Appellants' petition for a rehearing was denied August 6, 1980. Tobriner, J., did not participate therein. Bird, C. J., was of the opinion that the petition should be granted.