# IN THE SUPREME COURT OF CALIFORNIA

TRUCK INSURANCE EXCHANGE,

Plaintiff and Appellant,

v.

KAISER CEMENT AND GYPSUM CORP. et al.,

Defendants, Cross-complainants and Appellants;

LONDON MARKET INSURERS,

Defendant and Appellant;

INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

Cross-defendant and Appellant;

GRANITE STATE INSURANCE COMPANY et al.,

Defendants and Respondents.

S273179

Second Appellate District, Division Four
B278091

Los Angeles County Superior Court
BC249550

June 17, 2024

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

TRUCK INSURANCE EXCHANGE v. KAISER CEMENT
AND GYPSUM CORP.

S273179

Opinion of the Court by Groban, J.

This appeal requires us to decide when a first-level excess insurer's indemnity obligations attach in the context of a continuous injury that triggers multiple policy periods. In *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215 (*Montrose III*),[1] we addressed the sequence in which an insured could access its excess insurance policies for continuous environmental damage that had occurred over two decades. The insured sought a rule of "vertical exhaustion," which would allow it to access an excess insurance policy as soon as all the directly underlying insurance from that policy period (i.e., any primary and any excess policies with a lower attachment point) were exhausted. (See *id.* at p. 225.) The insurer sought a rule of "horizontal exhaustion," which would not allow the insured to access an excess policy until it had exhausted every excess policy with a lower attachment point across all relevant policy periods. (See *ibid.*) The parties to *Montrose III* did not dispute that all primary policies had been exhausted. Thus, the only issue before us was whether, upon exhaustion of all primary policies, the availability of excess

_____

[1] Because *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, is the third and most recent decision in a series of cases involving the Montrose litigation, the Court of Appeal and the parties refer to it as "*Montrose III*." We will use the same short form here.

1

policies was governed by a rule of vertical or horizontal exhaustion. (See *id*. at p. 226, fn. 4 ["Because the question is not presented here, we do not decide when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted"].)

This case requires us to resolve the question that we left open in *Montrose III*: whether standard language in commercial general liability policies that are excess to *primary* insurance policies should be interpreted to require vertical or horizontal exhaustion. In other words, can an insured access a first-level excess insurance policy upon exhaustion of underlying primary insurance obtained for the same policy period (vertical exhaustion), or is the insured required to exhaust *all* primary policies issued during the continuous period of damage (horizontal exhaustion)?

The appellant in this case is Truck Insurance Exchange (Truck), a primary insurer for Kaiser Cement and Gypsum Corporation (Kaiser). Truck filed an equitable contribution claim against several insurers that had issued first-level excess policies to Kaiser for policy years where the directly underlying primary policy had been exhausted. Relying on our reasoning in *Montrose III*, *supra*, 9 Cal.5th 215, Truck argued that the excess insurers' indemnity obligations were triggered immediately upon exhaustion of the directly underlying primary policies. Truck further reasoned that because the excess insurers owed a coverage duty to Kaiser, they were effectively responsible for indemnifying the same loss as Truck and should therefore be required to contribute to Truck's coverage costs. The excess insurers, however, argued that they had no duty to indemnify Kaiser until it had exhausted every primary policy

2

issued during the period of continuous damage (including the policy Truck had issued), and thus there was no possible basis for contribution. According to the excess insurers, *Montrose III*'s analysis is limited to excess policies that sit over other *excess* policies, not first-level excess policies that sit over *primary* insurance. The Court of Appeal agreed that *Montrose III* did not extend to excess policies that sit over primary insurance, which has characteristics that are distinct from excess insurance including immediate coverage and defense obligations. In so ruling, the court rejected *SantaFe Braun, Inc. v. Insurance Co. of North America* (2020) 52 Cal.App.5th 19 (*SantaFe*), which held that *Montrose III*'s reasoning *does* apply in the context of first-level excess policies. The court further concluded that because the excess insurers had no coverage obligation under their policies until all primary insurance had been exhausted (including Truck's primary policy), Truck was not entitled to contribution.

Contrary to the Court of Appeal, we conclude that our analysis in *Montrose III* applies equally here. The language of the first-level excess policies at issue in this case is essentially identical — and in some cases *actually* identical — to the policy language in the higher-level excess policies that we considered in *Montrose III.* The policies also share many of the same characteristics that we found "strongly suggest[ive]" (*Montrose III*, *supra*, 9 Cal.5th at p. 233) of vertical, rather than horizontal, exhaustion. Thus, as in *Montrose III,* we believe the first-level excess policies are most reasonably construed as requiring only vertical exhaustion.

The excess insurers seem to concede — or at least do little to dispute — that the language of their policies is substantially

identical to the policies at issue in *Montrose III*. They argue, however, that such language should be assigned a different meaning in the current context given the "qualitative distinctions" between primary and excess insurance. Specifically, they note that primary insurers generally receive higher premiums and offer lower liability limits in exchange for coverage that attaches immediately upon the happening of an insurable occurrence and provide defense costs. We are not persuaded that those distinctions justify adopting a different interpretation of the exact same policy language that we construed in *Montrose III*.

Our conclusion that the first-level excess policies only require vertical exhaustion does not, however, fully resolve the questions presented in this appeal. Unlike in *Montrose III,* which involved an insurance coverage dispute between an insured and its insurer, this case involves a *contribution* claim between coinsurers. While coverage disputes between insureds and their insurers are a form of contract action that turns on the meaning of the policy language, "an equitable contribution claim between coinsurers is not based upon contract, but instead involves ' "equitable principles designed to accomplish ultimate justice in the bearing of a specific burden." ' " (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.* (2012) 204 Cal.App.4th 1214, 1227–1228 (*Axis*), quoting *Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369 (*Signal*).) Although the terms of the relevant policies are an important factor when deciding whether contribution is appropriate, courts may consider "a variety of [other] factors" (*Travelers Casualty & Surety Co. v. Century Surety Co.* (2004) 118 Cal.App.4th 1156, 1162), including " ' "the nature of the claim, the relation of the insured to the insurers

. . . and any other equitable considerations." ' " (*Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 974 (*Unigard*); see *Signal*, at p. 369.) Thus, our finding that the first-level excess policies do not require the insured to horizontally exhaust primary insurance issued during different policy periods does not resolve whether Truck is entitled to *contribution* from the excess insurers.

In the proceedings below, the excess insurers and Kaiser argued that even if the policy agreements were, as a matter of contract interpretation, properly construed as authorizing the insured (Kaiser) to access its first-level excess insurance upon exhaustion of the directly underlying primary insurance, it would nonetheless remain unfair as a matter of *equity* to allow a primary insurer to obtain contribution from an excess insurer given the distinct roles those two types of carriers play in covering a loss. (See generally *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1080 (*Dart*) ["the obligation of successive primary insurers to cover a continuously manifesting injury is a separate issue from the obligations of the insurers to each other"].) They further contended that ordering contribution would be particularly unfair under the specific circumstances of this case because it would effectively allow Truck to pay less insurance than it had promised to Kaiser, while leaving Kaiser and injured asbestos claimants with less overall coverage.

Because the Court of Appeal rejected Truck's contribution claim based entirely on its erroneous interpretation of the excess policies (i.e., that the excess insurers had no coverable obligation under the policies until Kaiser horizontally exhausted all primary insurance), it did not reach these alternative

arguments regarding the fairness of ordering the excess insurers to contribute to Truck. Having now concluded that the excess policies require only vertical exhaustion, we remand the matter to allow the Court of Appeal to address these alternative arguments in the first instance. (See *Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1149 (*Hamilton*) ["It is appropriate to remand for the Court of Appeal to resolve . . . in the first instance" issues that the court chose "not [to] reach because of its holdings"].)

## I. BACKGROUND

From 1944 through the 1970s, Kaiser manufactured asbestos-containing products at numerous different facilities. By 2004, more than 24,000 claimants had filed product liability suits against Kaiser alleging that they had suffered bodily injury (primarily asbestosis or cancer) as a result of exposure to Kaiser's asbestos products. (See *London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648, 652.) Kaiser tendered these claims to Truck, one of several primary insurers that had issued commercial general liability (CGL) policies to Kaiser during the relevant time period.

In 2001, Truck initiated this insurance coverage action to determine its indemnity and defense obligations to Kaiser. Several years later, Truck amended its complaint to add a cause of action for contribution against several of Kaiser's excess insurers. The litigation has generated multiple appellate decisions that have addressed a wide range of complex questions regarding insurance coverage and policy interpretation. In this appeal, we review only one of the issues decided by the Court of Appeal: Whether Truck is entitled to contribution from various

coinsurers that issued first-level excess policies to Kaiser during the period in question.

### A. *The All Sums with Stacking Approach to Continuous Injuries*

Before turning to the procedural history of the parties' current dispute, it is helpful to review general principles of insurance law that govern "continuous or 'long-tail' injury . . ., where damage occurs over multiple policy periods." (*Montrose III*, *supra*, 9 Cal.5th at pp. 226–227.) In the context of standard "occurrence based" CGL insurance policies,[2] California has adopted what is known as the "all-sums-with-stacking" approach to continuous injuries. This approach has three primary components. First, in *Montrose I*, *supra*, 10 Cal.4th 645, we adopted the "continuous injury trigger of coverage" principle (*id.* at p. 685), under which "bodily injury and property damage that is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." (*Id.* at p. 655.) In other

---

[2] While the specifics of their language may vary, traditional "occurrence based" CGL policies generally insure the policyholder for " 'all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury, or . . . property damage to which this insurance applies, caused by an occurrence.' " (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 656 (*Montrose I*); see *id.* at pp. 669–670 [discussing drafting history of standardized CGL policy language].)

words, the insured may call upon any policy that was in effect during the continuous period of injury.[3]

Second, in *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, we adopted "the 'all sums' rule" (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 191 (*Continental*)), pursuant to which each policy triggered during a long-tail injury is potentially liable for the total amount of the loss, regardless of whether a portion of the loss occurred outside the policy's coverage period. The rule "envisions that each successive insurer is potentially liable for the entire loss up to its policy limits. When the entire loss is within the limits of one policy, the insured can recover from that insurer, which may then seek contribution from the other insurers on the risk during the same loss." (*Id.* at p. 200.)

Third, in *Continental*, *supra*, 55 Cal.4th 186, we construed language in standard CGL policies to permit "stacking," which allows an insured "to add together the maximum limits of all consecutive policies that [were] in place during the [period of continuous injury]." (12 Couch on Insurance (3d ed. 2010) § 169:5; see *Continental*, at p. 200 [" 'stacking' generally refers to the stacking of policy limits across multiple policy periods that were on a particular risk"].) In other words, " '[w]hen the

---

[3]    In *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, the court held that asbestos-related bodily injury claims qualify as a form of continuing injury that triggers all policies " 'in effect from [the claimant's] first exposure to asbestos or asbestos-containing products until date of death or date of claim, whichever occurs first[.]' " (*Id.* at p. 43.) The parties appear to assume (at least for the purposes of this appeal) that *Armstrong* states the proper trigger rule for asbestos-related injury claims. We will do the same.

policy limits of a given insurer are exhausted, [the insured] is entitled to seek indemnification from any of the remaining insurers [that were] on the risk [during the continuous period of injury].' " (*Continental*, at p. 200.)  If, for example, an insured purchased 10 annual policies that each had a coverage limit of $1 million, and all the policies were triggered by a continuous injury, the insured would be permitted to stack all of the policies to collect up to $10 million in total coverage.  (See *id.* at p. 201 [the "all-sums-with-stacking indemnity principle . . . 'effectively stacks the insurance coverage from different policy periods to form one giant "uber-policy" with a coverage limit equal to the sum of all purchased insurance policies' "].)

In adopting this all-sums-with-stacking approach, however, we have cautioned that "future . . . contracting parties can write into their policies whatever language they agree upon, including limitations on indemnity, equitable pro rata coverage allocation rules, and prohibitions on stacking." (*Continental*, *supra*, 55 Cal.4th at p. 202.)

### B.  *Summary of Kaiser's Insurance Policies*

Having summarized general principles of insurance law relating to continuous injuries, we turn now to the specific facts at issue in this appeal.  During the relevant time period, Kaiser purchased primary and excess CGL insurance from numerous different insurers.  "Primary insurance refers to the first layer of coverage, whereby 'liability attaches *immediately* upon the happening of the occurrence that gives rise to liability.' " (*Montrose III*, *supra,* 9 Cal.5th at p. 222.)  "Primary insurers generally have the primary duty of defense." (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597.)  "Excess insurance, by contrast, 'refers to indemnity

coverage that attaches upon the exhaustion of underlying insurance coverage for a claim.' [Citation.] An excess insurer's coverage obligation begins once a certain level of loss or liability is reached; that level is generally referred to as the ' "attachment point" ' of the excess policy." (*Montrose III*, at pp. 222–223.)

Kaiser's primary insurers included Fireman's Fund Insurance Company (Fireman's Fund) (1947–1964), Truck (1964 to 1983), Home Insurance Company (1983–1985) and National Union Fire Insurance Company (1985–1987). The primary policy that Truck issued for the 1974–1975 period provided a "per occurrence" limit of $500,000, meaning that Truck would provide up to $500,000 of coverage for each claim alleging injurious exposure to asbestos. However, the policy did not include any aggregate limit of coverage. In contrast, all the primary policies issued by non-Truck insurers *did* contain an aggregate limit on coverage.

Kaiser also obtained first-level excess policies from multiple insurers. The first-level excess policies that are the subject of Truck's contribution claim were issued for policy years in which Truck was not the primary insurer. London Market Insurers (LMI) provided first-level excess policies during the years that Fireman's Fund was the primary insurer (1947 to 1964), while First State (1983–1984) and Westchester Fire (1984–1985) each provided a first-level excess policy during the years that Home Insurance Company was the primary insurer.

Each of the first-level excess policies include language stating that coverage will not attach until Kaiser has exhausted underlying primary policies that are listed in a schedule of underlying insurance. The policies require Kaiser to maintain those scheduled primary policies during the relevant period of

coverage. Each excess policy also includes an "other insurance" provision that states, in a variety of ways, that the insured must also exhaust any "other insurance" or "other underlying insurance" before the excess policy can be accessed.[4]

### C. Procedural History

Kaiser assigned all asbestos-related bodily injury claims that triggered Truck's 1974 primary policy — which presumably includes any claims alleging that the claimant's initial exposure to asbestos occurred in or before 1974 (see *ante*, p. 8, fn. 3) — to the 1974 policy. According to the excess insurers, Kaiser selected Truck's 1974 policy because it "has no aggregate limit, does not require Kaiser to pay an allocated share of defense (like Truck's other primary policies), and . . . has the lowest deductible per occurrence ($5,000)." Truck subsequently entered into agreements with the other primary insurers to share defense and indemnity costs.

    *1.*  Kaiser Cement and Gypsum Corp. v. Insurance
        Co. of Pennsylvania *(Apr. 8, 2013, B222310)*
        *(nonpub. opn.)*

Truck initiated this litigation in 2001 to determine its coverage obligations to Kaiser. In a prior appeal, *Kaiser Cement and Gypsum Corp. v. Insurance Co. of Pennsylvania* (Apr. 8, 2013, B222310) (review den. and opn. ordered nonpub. July 17, 2013) (*Kaiser Cement*), the Court of Appeal decided two issues

---

[4]     The specific wording of these "other insurance" clauses is explored in more detail below.

that have relevance to the current dispute.[5]  First, the court held that Kaiser could not access a 1974 first-level excess policy that sat over Truck's 1974 primary policy until Kaiser had horizontally exhausted every primary policy issued during the claimant's period of continuous damage.  In support, the court relied on language in the excess policy stating that the insurer's indemnity obligations would attach upon exhaustion of Truck's 1974 primary insurance plus the " ' "applicable limit(s) of any other underlying insurance collectible by the insured." ' " (Italics omitted.)  Following the reasoning of *Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329 (*Community Redevelopment*) — a case we discuss in more detail below — the court explained that the "policy's reference to 'any other underlying insurance' necessarily means 'whatever' . . . primary insurance is available to Kaiser — not, as Kaiser suggests, only that primary insurance that expressly covers the 1974 policy year."

Second, the court ruled that Truck's 1974 primary policy included an anti-stacking provision that prohibited Kaiser from obtaining coverage from any of the other primary policies Truck had issued between 1964 and 1983.  Although the court acknowledged that insureds are generally permitted to stack successive policies (see *Continental*, *supra*, 55 Cal.4th at p. 200; *ante*, at pp. 8–9), it reasoned that Truck's 1974 policy contained language that expressly prohibited Kaiser from receiving

---

[5]  An unpublished decision may be cited "[w]hen the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel."  (Cal. Rules of Court, rule 8.1115(b)(1).) *Kaiser Cement* is relevant here as law of the case and we cite it solely for that reason.

indemnification from any other policy that Truck had issued. As a result of the court's ruling, Truck's total indemnity obligation for each asbestos claim triggering the 1974 policy was only $500,000, which was substantially less than the $8.3 million per claim that the excess insurers allege Truck would have been obligated to pay if Kaiser was allowed to stack all 19 of its Truck policies. In subsequent litigation, it was determined that all primary policies issued by non-Truck insurers had been exhausted as of 2004.

Thus, the *Kaiser Cement* decision had two important effects on the insurance coverage litigation. First, the court's interpretation of the "other insurance" provision in Kaiser's 1974 first-level excess policy effectively precluded Kaiser from accessing any of its excess insurance until it had exhausted every primary policy issued during the period of continuous injury. Second, Kaiser could not obtain coverage from any of the primary policies that Truck had issued other than the 1974 policy. As a result of those rulings, and the subsequent exhaustion of all primary policies that had been issued by non-Truck insurers, Truck's 1974 policy is currently the *only* primary insurance that remains available to Kaiser for any asbestos-related bodily injury claim alleging initial exposure in or before the 1974–1975 policy period. As noted, that policy requires Truck to provide up to $500,000 for each asbestos claim, with any amounts exceeding that level going to excess insurance. Following *Kaiser Cement*, various excess insurers entered into an agreement with Kaiser regarding the funding of the excess portion of any individual claims that exceed Truck's $500,000 obligation.

### 2. *Current litigation*

At some point after it was determined that Truck's 1974 policy was the only remaining primary insurance (but before we had decided *Montrose III*), Truck filed the current equitable contribution claim against each of the first-level excess insurers that sit above the now-exhausted primary policies that were issued by non-Truck insurers. Presenting arguments that are substantially similar to those that Kaiser had raised in *Kaiser Cement*, Truck argued that the first-level excess insurers' indemnity obligations to Kaiser attached upon exhaustion of the directly underlying primary policies. Truck further contended that because the excess insurers' coverage obligations had been triggered, they should be ordered to "contribute to Truck's indemnity and defense obligations under the 1974 policy." The excess insurers, however, argued there was no basis for contribution because all of the applicable excess policies contained "other insurance" provisions that conditioned coverage on the exhaustion of all available underlying primary insurance that had been issued during the continuous period of damage, which necessarily included Truck's 1974 primary policy.

Following a bench trial in 2016, the trial court issued an order denying Truck's contribution request. Citing *Community Redevelopment*, *supra*, 50 Cal.App.4th 329, and the *Kaiser Cement* decision previously issued in this litigation (see *ante*, at pp. 11–13), the trial court agreed with the excess insurers that the "other insurance" provisions in the first-level excess policies called for horizontal exhaustion of all primary insurance, including Truck's 1974 primary policy. The trial court further reasoned that because the excess insurers' policies did not

attach until Truck's 1974 primary policy was exhausted, there was no possible basis for Truck to receive contribution.

While Truck's appeal of the order denying contribution was pending, we issued our decision in *Montrose III*, *supra*, 9 Cal.5th 215. As discussed in more detail below, *Montrose III* held that an insured's excess insurance policies required only vertical exhaustion, meaning that the insurers' indemnity obligations attached as soon as the insured had exhausted any excess policies with lower attachment points that had been issued for the same policy year. In reaching that conclusion, we rejected the excess insurers' contention that the policies' "other insurance" provisions required horizontal exhaustion of all excess policies with lower attachment points that had been issued during the period of continuous injury.

On appeal, Truck argued that *Montrose III*'s interpretation of "other insurance" policies had effectively rejected (and overruled) the Court of Appeal's analysis in *Community Redevelopment* and *Kaiser Cement*. Truck noted that a recent appellate decision, *SantaFe*, *supra*, 52 Cal.App.5th 19, had reached exactly that conclusion in a coverage dispute in which the insured had sought access to a first-level excess policy immediately upon exhaustion of the directly underlying primary policy. The *SantaFe* court held that *Community Redevelopment* and other decisions that had embraced horizontal exhaustion based on "other insurance" provisions had "rel[ied] on an interpretation of policy language rejected by the Supreme Court in *Montrose III*." (*SantaFe*, at p. 30.)

The Court of Appeal, however, disagreed with Truck and expressly rejected *SantaFe*'s application of *Montrose III*. In the court's view, *Montrose III*'s interpretation of "other insurance"

15

provisions was limited to situations involving "multiple layers of excess insurance" and had no application to "layers of primary and excess insurance." In support, the court noted the "qualitative[]" distinctions between primary and excess insurance. According to the court, whatever effect "other insurance" clauses might have in other contexts, for purposes of first-level excess policies that sit over primary insurance, such provisions were most reasonably construed to include any primary policies that had been issued during the relevant period of continuous injury.

Having concluded that the first-level excess insurers did not owe Kaiser any indemnity obligation until Kaiser had exhausted every primary policy issued during the period of continuous damage, the court concluded there was no possible basis to award Truck contribution. We granted review.

## II.  DISCUSSION

### A.  Summary of Applicable Law

We begin our analysis by summarizing legal principles and prior decisional law that relate to the complex questions of insurance coverage presented in this appeal.

#### 1.  *Insurance coverage actions versus contribution action*

We have previously distinguished between two forms of insurance disputes: insurance coverage actions, which typically involve a dispute between an insured and an insurer regarding the insurer's indemnity and defense obligations, and equitable contribution claims, in which one insurer seeks recovery from another insurer that allegedly covered the same risk and failed to pay its proportionate share. (See, e.g., *Dart, supra*, 28 Cal.4th

at p. 1080 ["the obligation of successive . . . insurers to cover a continuously manifesting injury is a separate issue from the obligations of the insurers to each other. . . . '[A]pportionment among multiple insurers must be distinguished from apportionment between an insurer and its insured' "].)

Insurance coverage claims between an insured and its insurer are a form of contract dispute and thus focus on "the language of the insurance policies at issue." (*Montrose III*, *supra*, 9 Cal.5th at pp. 229–230.) " ' "Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] 'If contractual language is clear and explicit, it governs.' [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect ' "the objectively reasonable expectations of the insured." ' " ' [Citation.] If these rules do not resolve an ambiguity, we may then ' "resort to the rule that ambiguities are to be resolved against the insurer." ' " (*Id.* at p. 230, bracketed text in original.) " 'Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.' " (*Montrose I*, *supra*, 10 Cal.4th at p. 667.)

"[A]n equitable contribution claim between coinsurers[, in contrast,] is not based upon contract, but instead involves ' "equitable principles designed to accomplish ultimate justice in the bearing of a specific burden" ' " (*Axis*, *supra*, 204 Cal.App.4th at pp. 1227–1228, quoting *Signal*, *supra*, 27 Cal.3d at p. 369.) "In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has

paid more than its share of the loss or defended the action without any participation by the others. . . . The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 (*Fireman's Fund*).)

Under California law, there is no "definitive rule" that governs equitable contribution. (*Signal*, *supra*, 27 Cal.3d at p. 369.) Rather, when evaluating a contribution claim, courts should consider a variety of factors, including "the particular policies of insurance, the nature of the claim made, . . . the relation of the insured to the insurers" (*ibid.*) and " 'any other equitable considerations.' " (*Unigard*, *supra*, 79 Cal.App.4th at p. 974.) Although equitable contribution claims are not " 'controlled by the language of [the insurers'] contracts with the respective policy holders' " (*Signal*, at p. 369), we have emphasized that the policy language nonetheless remains an important factor. (See *ibid.* [courts should not impose contribution on an insurer that "contraven[es] . . . the provisions of its policy" absent "some compelling equitable consideration"]; *Unigard*, at p. 978.) As explained by one court, "if [an] insurer never had an obligation to provide coverage, it would be extremely unfair to enforce a contribution action." (*Axis*, *supra*, 204 Cal.App.4th at p. 1228.)

### 2. *Contribution between primary and excess insurers*

In the context of traditional "noncontinuous injury" insurance claims — meaning a claim that implicates only a single policy period — it has long been the rule that there is "no contribution between a primary and excess carrier without a

specific agreement to the contrary." (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1080; see *Fireman's Fund, supra,* 65 Cal.App.4th at p. 1294, fn. 4.) The basis for that rule is rooted in the purpose of contribution, which is to "equaliz[e] the common burden" (*Fireman's Fund,* at p. 1293) shared by coinsurers that "share the same level of liability on the same risk as to the same insured." (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089 (*Maryland*); see *Morgan Creek Residential v. Kemp* (2007) 153 Cal.App.4th 675, 684 [contribution applies only when there is a " 'common burden of liability' "].) When a claim implicates only a single policy period, and an excess policy provides that the insurer's coverage obligations attach upon exhaustion of the primary insurance listed in the schedule of underlying insurance, the excess and primary insurer cannot be said to "share the same level of liability." (*Maryland,* at p. 1089.)

That analysis becomes more complicated in the context of continuous injuries, which extend over multiple policy periods. In that circumstance, the question arises whether the excess insurers' indemnity obligations to the insured attach: (1) only after the exhaustion of all primary layers of insurance issued during the continuous period of injury (horizontal exhaustion); or (2) whether attachment occurs upon exhaustion of the directly underlying primary insurance that was issued during the same policy year (vertical exhaustion). If the excess insurers have no coverage obligation until *all* primary policies have exhausted (horizontal exhaustion), it follows that the excess insurer cannot be said to be on the same level of liability as *any* of the primary insurers, thus precluding any basis for

contribution between the two types of insurers. In effect, horizontal exhaustion results in the same situation between excess and primary insurers that occurs where a claim implicates only one policy period: the excess insurer and primary insurer remain on distinct levels of liability, with the excess insurer's obligations being triggered only after the primary coverage is exhausted, thus precluding contribution.

Under vertical exhaustion, however, the excess insurer owes an indemnity obligation to the insured as soon as the directly underlying primary policy has exhausted. That is true even if primary insurance issued for a precedent or subsequent policy period remains unexhausted (and thus available to the insured). Thus, unlike the situation with horizontal exhaustion, under a rule of vertical exhaustion, a first-level excess insurer from one policy period and a primary insurer from a different policy period might simultaneously owe coverage to the same insured for the same injury. In that situation, it becomes less clear that the excess insurer remains on a different "level of liability" (*Maryland, supra,* 81 Cal.App.4th at p. 1089) than primary insurers that issued unexhausted policies during different periods of the continuous injury.

Prior to our decision in *Montrose III, supra,* 9 Cal.5th 215, the leading case addressing contribution between primary and excess injuries in the continuous injury context was *Community Redevelopment, supra,* 50 Cal.App.4th 329. The insured in *Community Redevelopment* obtained annual primary policies from United between 1982–1985. For the 1985–1986 period, the insured obtained a primary policy from State Farm and a first-level excess policy from Scottsdale. The Scottsdale policy stated that its indemnity obligations would attach upon exhaustion of

the underlying State Farm policy " 'plus the applicable limits of any other underlying insurance collectible by the insured.' " (*Id.* at p. 335, italics and capitalization omitted.)

State Farm entered a settlement on behalf of the insured that exhausted the limits of its 1985–1986 primary policy. United thereafter brought a contribution action against Scottsdale, contending "that Scottsdale had a duty to . . . contribute to the primary coverage burden as soon as State Farm's underlying primary policy was exhausted. According to United, Scottsdale's policy was expressly excess to State Farm's policy; as soon as the latter was exhausted, Scottsdale's duty arose and the existence of other primary coverage was irrelevant." (*Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 337.)

The court rejected that argument, explaining that "[i]t is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until *all* of the primary insurance has been exhausted." (*Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 339.) In support, the court cited case law that addressed excess coverage in the context of noncontinuous injury claims (i.e., injuries that triggered only one policy period). The courts in those cases ruled that first-level excess policies containing "other insurance" provisions required not only the exhaustion of the primary insurance expressly listed in the excess policy, but also any other primary insurance the insured had obtained for that period. (See *ibid.*)

The *Community Redevelopment* court concluded that "other insurance" provisions should apply the same way in the context of a continuous injury that triggers multiple policy

periods.  According to the court, the "other insurance" provision in Scottsdale's excess policy made clear that the coverage was purchased "as excess to the . . . primary policy issued by State Farm" and " 'any other underlying insurance collectible by the [insured parties].' "  (*Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 338, italics omitted.)  In the court's view, "[t]he only reasonable interpretation of this policy language is that the term 'underlying insurance' must be read to include all available primary insurance, not just the policy expressly listed on the schedule of underlying insurance."  (*Id.* at p. 341.)  The court reasoned that because Scottsdale's excess policy called for horizontal exhaustion of all primary insurance, Scottsdale remained on a different level of liability than United's primary policy, thus precluding contribution.

As noted above, the Court of Appeal in this case (and in its prior *Kaiser Cement* decision) chose to follow the reasoning of *Community Redevelopment*, concluding both that:  (1) the "other insurance" provisions unambiguously compelled a rule of horizontal exhaustion; and (2) because the first-level excess insurers owed no coverage obligation to the insured until all primary insurance had exhausted, there was no possible basis for Truck to obtain contribution.[6]

---

[6]    Although the Court of Appeal's decision denying contribution in the instant matter did not rely on its prior ruling regarding horizontal exhaustion set forth in the *Kaiser Cement* appeal, the excess insurers nonetheless contend that *Kaiser Cement*'s ruling on horizontal exhaustion is now "law of the case" and cannot be relitigated here.  The law of the case doctrine generally "precludes a party from obtaining appellate

### 3. Montrose III

In *Montrose III, supra,* 9 Cal.5th 215, we addressed the application of "other insurance" provisions in the context of excess policies issued during successive periods of a continuous injury. The insured was sued for causing continuous environmental contamination between 1947 and 1982. During that period, the insured obtained annual policies for primary insurance and multiple layers of excess insurance. The parties stipulated that all primary insurance had been exhausted. The question we had to decide was "the sequence in which [the insured could] access the excess insurance policies covering this period." (*Id.* at p. 222.) The insured sought a rule of vertical exhaustion, which would allow it to access an excess insurance policy upon the exhaustion of any excess policies with lower attachment points that had been issued for the same policy

---

review of the same issue more than once in a single action." (*Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 62.) It is well-settled, however, that the doctrine may be disregarded where the "controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations." (*People v. Stanley* (1995) 10 Cal.4th 764, 787.) Even assuming that application of law of the case would otherwise be appropriate, we are satisfied — as apparently was the Court of Appeal — that our intervening decision in *Montrose III, supra,* 9 Cal.5th 215, justifies departure from the doctrine here.

We also find no merit in the excess insurers' contention that various arguments and admissions Truck made in the *Kaiser Cement* appeal regarding the anti-stacking issue judicially estop Truck from now arguing that under *Montrose III, supra,* 9 Cal.5th 215, the first-level excess policies should be construed as attaching upon exhaustion of the directly underlying primary policy.

period. The insurer sought a rule of horizontal exhaustion, which would not allow the insured to access an excess policy until it had exhausted *every* excess policy with a lower attachment point that had been issued during the continuous period of injury. (See *id.* at p. 229.)

The dispute centered on the meaning of "other insurance" clauses in the excess insurance policies. Those clauses provided, in varying ways, that the policies shall be excess to "other insurance" or " 'other underlying insurance' " (*Montrose III*, *supra*, 9 Cal.5th at pp. 224–225, italics omitted) available to the insured, "whether or not the other insurance is specifically listed in the policy's schedule of underlying insurance." (*Id.* at p. 230.) Citing *Community Redevelopment*, *supra*, 50 Cal.App.4th 329, the insurers argued that the "other insurance" clauses "call[ed] for a rule of horizonal exhaustion because they restrict indemnification from any excess policy until the insured has exhausted all other available insurance — which, in a case of long-tail injury, means every policy with a lower attachment point from every policy period triggered by the continuous injury." (*Montrose III*, at p. 230.) The insureds, however, argued that the "other insurance" clauses were intended to refer only to "other insurance" policies with lower attachment points that were in effect *during the same policy period as the overlaying excess policy*. (See *id.* at pp. 230–231.)

While finding that both parties had offered reasonable interpretations of the "other insurance" provisions (see *Montrose III, supra*, 9 Cal.5th at pp. 230, 234), we ultimately concluded that when read "in light of background principles of insurance law, and considering the reasonable expectations of the parties" (*id.* at p. 222), the policy language was "most naturally read to

mean that [the insured] may access its excess insurance whenever it has exhausted the other directly underlying excess insurance policies that were purchased for the same policy period" (*id.* at p. 234).

Turning first to the text of the "other insurance" provisions, we found that certain characteristics weighed against the excess insurers' assertion that such language unambiguously mandated a rule of horizontal exhaustion. First, none of the policies contained any language "clearly or explicitly stat[ing] that [the insured] must exhaust insurance with lower attachment points *purchased for different policy periods.*" (*Montrose III*, *supra*, 9 Cal.5th at p. 230.) Second, we noted that some formulations of the "other insurance" clauses included broad language that, "[i]f . . . read to apply to insurance purchased for other policy periods, . . . could fairly be understood to require the exhaustion of *every* other insurance policy at *every* attachment point — not merely, as the insurers' theory of horizontal exhaustion would have it, excess policies from other policy periods that contain lower attachment points." (*Id.* at p. 231.) Third, we explained that contrary to the excess insurers' proposed interpretation, our prior decisions (and the decisions of several other jurisdictions) made clear that "other insurance" provisions "have not traditionally been used to address questions concerning the obligation of successive insurers to indemnify policyholders for a continuously manifesting injury." (*Id.* at p. 232.) Instead, such clauses have historically been understood to "address '[a]llocation questions with respect to overlapping *concurrent policies.*' " (*Ibid.*)

Looking next to the text of the excess policies as a whole, we found that "other aspects of the insurance policies strongly

suggest[ed] that the exhaustion requirements were meant to apply to directly underlying insurance and not to insurance purchased for other policy periods." (*Montrose III*, *supra*, 9 Cal.5th at p. 233.) First, we noted that many of the policies "explicitly state their attachment point, generally by referencing a specific dollar amount of underlying insurance in the same policy period that must be exhausted." (*Ibid.*) We explained that under the "insurers' theory of horizontal exhaustion," there would be no coverage until the insured had exhausted that attachment amount "*for every relevant policy period*" (*ibid.*), thus substantially increasing the "operative attachment point" well beyond what the terms of the policy suggested.

Second, and "[r]elatedly" (*Montrose III*, *supra*, 9 Cal.5th at p. 234), we noted that the excess policies "regularly include or reference schedules of underlying insurance — all for the same policy period" (*ibid.*). We explained that under the insured's reading, "these schedules provide a presumptively complete list of insurance coverage that must be exhausted before the excess policy may be accessed, with the 'other insurance' clauses serving as a backstop to prevent double recovery in the rare circumstance where underlying coverage changes after the excess policy is written. [Citation.] But under the insurers' rule of horizontal exhaustion, these schedules would represent only a fraction — perhaps only a small fraction — of the insurance policies that must be exhausted before a given excess policy may be accessed." (*Ibid.*)

Looking beyond the language of the parties' policies, we further concluded that "[c]onsideration of the parties' reasonable expectations favors a rule of vertical exhaustion rather than horizontal exhaustion." (*Montrose III*, *supra*,

9 Cal.5th at p. 234.) First, we noted that "applying the horizontal exhaustion rule would be far from straightforward" given the lack of "standardization" between the excess policies on issues such as attachment points, level of coverage and specific terms and conditions. (*Ibid*.) To illustrate the complexity, we noted that "the first layer of excess insurance in 1984 . . . would appear to reach as high as the 13th layer of excess coverage in 1974. To which horizontal layer does the 1984 policy belong? The policies do not say. Nor does anything in the text of these policies tell us how an 'other insurance' clause in a policy from one period ought to apply to a policy from another period that contains both a lower attachment point and a higher coverage limit. The policies' silence on these basic, foundational questions tends to undermine the idea the parties expected such a rule to apply." (*Id*. at p. 235.)

We also noted that because "exclusions, terms, and conditions may vary from one policy to another, a rule of horizontal exhaustion would create significant practical obstacles to securing indemnification. . . . Such a rule would put the insured to the considerable expense of establishing a right to coverage under the definitions, terms, conditions, and exclusions from policies in every policy period triggered by the continuous injury. Coverage under less restrictive policies would be delayed until more restrictive policy terms are adjudicated. In sum, '[h]orizontal exhaustion would create as many layers of additional litigation as there are layers of policies.' " (*Montrose III*, *supra*, 9 Cal.5th at p. 235.)

We rejected the excess insurers' contention that a rule of vertical exhaustion would frustrate the parties' reasonable expectations by unfairly requiring "a single insurer to shoulder

the burden" of indemnifying " 'decades' worth of environmental damage.' " (*Montrose III*, *supra*, 9 Cal.5th at p. 236.) We noted that this argument was "not different in kind from arguments we have already considered and rejected in adopting the all-sums-with-stacking approach to the coverage of long-tail injuries" (*ibid.*), explaining that "[t]here is no evident unfairness to insurers when their insureds incur liabilities triggering indemnity coverage under the negotiated policy contract" (*ibid.*). We further explained that a rule of vertical exhaustion "does not alter the usual rules of equitable contribution between insurers. An insurer required to provide excess coverage for a long-tail injury may lessen its burden by seeking reimbursement from other insurers that issued policies during the relevant period." (*Ibid.*)

We also rejected the insurers' reliance on *Community Redevelopment*, *supra*, 50 Cal.App.4th 329, explaining that a contribution action between a primary insurer and an excess insurer presented "a meaningfully different scenario" than a *coverage* action between an insured and its excess insurers, and thus "offer[ed] no real lessons for resolving the question now before us." (*Montrose III*, *supra*, 9 Cal.5th at p. 237.) In a footnote, we emphasized that because the question had not been presented, we need not "decide when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted." (*Id.* at p. 226, fn. 4.)

## B. Analysis

As in *Montrose III*, we are faced with questions regarding whether language in standard CGL excess insurance policies impose a rule of vertical or horizontal exhaustion in the context

of continuous injury insurance claims. The Court of Appeal concluded that because the excess policies at issue in this case sat above primary insurance, they were most reasonably construed as requiring the insured (Kaiser) to horizontally exhaust all primary insurance, including Truck's 1974 policy. The court further reasoned that because the excess policies did not create any coverage obligation until Truck's policy was exhausted, there was no possible basis for Truck to receive contribution.

Given that the court's contribution analysis turns entirely on its interpretation of the first-level excess policies, we will begin our review by assessing the court's construction of those contracts, which is "a question of law" to which we apply independent review. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.)[7]

---

[7] The excess insurers argue that because this case involves a claim for equitable contribution, we should apply an abuse of discretion standard of review. While it is true that our courts have applied a deferential standard to some aspects of equitable contribution awards that are not at issue in this case (such as the trial court's chosen method for allocating a loss among insurers), the Court of Appeal's interpretation of the excess policies remains a question of law to which we apply de novo review. (Compare *Fireman's Fund, supra*, 65 Cal.App.4th at p. 1308 ["trial court's determination of the correct allocation [method] . . . for purposes of contribution" is reviewed for abuse of discretion] with *Truck Ins. Exchange v. AMCO Ins. Co.* (2020) 56 Cal.App.5th 619, 629 [applying de novo review where contribution claim turned on interpretation of insurance policies]; *Certain Underwriters at Lloyds, London v. Arch Specialty Ins. Co.* (2016) 246 Cal.App.4th 418, 429 ["Although equitable contribution may call for judicial discretion, here the

### 1. *The Court of Appeal erred in interpreting the policy language*

As was the case in *Montrose III*, the Court of Appeal's interpretation of the excess policies centered on the meaning of the "other insurance" clauses in the excess insurance policies. The text of those clauses are as follows:

- The LMI policies in effect from 1953–1958 provide that liability shall attach only after the primary insurers listed in the schedule of underlying insurance have paid "the full amount of their respective ultimate loss," and then define "ultimate net loss" as "the sums paid in settlement of losses for which the Assured is liable after making deductions for all recoveries, salvages *and other insurances* (other than recoveries under the policy/ies of the [scheduled primary insurers]), whether recoverable or not" (italics added);

- The LMI policies in effect from 1958–1964 include an independent "Other Insurance" clause that provides: "If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with other insurance";

- The First State policy in effect from 1983–1984 provides that the Company shall be liable for loss in excess of "an amount equal to the limits of liability

_____

trial court expressly stated it decided the matter as a question of law, and our review is de novo"].)

indicated beside the underlying insurance listed in the Schedule A of underlying insurance, *plus the applicable limits of any other underlying insurance collectible by the insured*"; "[i]f other collectible insurance with any other insurer is available to the insured covering in loss covered here [*sic*], except insurance purchased to apply in excess of the sum of [this policy], the insurance hereunder shall be in excess of and not contribute with such other insurance" (italics added).[8]

Following the analysis in *Community Redevelopment*, 50 Cal.App.4th 329, the court interpreted these "other insurance" provisions as unambiguously requiring Kaiser to exhaust all primary policies that it had purchased *for every policy period triggered by the continuous injury*. Truck, however, contends that our core holding in *Montrose III* — that standard "other insurance" provisions appearing in excess policies are only intended to refer to insurance *purchased for the same policy period* — applies equally in the context of excess policies that sit over primary insurance. As discussed in more detail below, we agree with Truck that the policy language at issue here cannot be meaningfully distinguished from the policies that we addressed in *Montrose III*. We also agree that the qualitative distinctions between primary and excess insurance do not justify assigning an entirely different meaning to standardized "other insurance" clauses merely because the excess policy sits over primary insurance rather than another level of excess insurance.

---

[8] The Westchester policy in effect from 1984–1985 includes language that is essentially identical to the First State policy.

The Court of Appeal made no attempt to differentiate the text of the "other insurance" provisions at issue here and those at issue in *Montrose III*. Nor have the excess insurers attempted to do so in their briefing. That is not particularly surprising given that the provisions are substantially identical, and in several formulations *exactly identical*,[9] each providing in various ways that the excess policy shall be excess to the underlying primary policy identified in the schedule of underlying insurance along with any "other insurance" or "other underlying insurance" available to the insured. As in *Montrose III*, none of the provisions explicitly reference "other insurance" purchased *for different policy periods*.

Our observations in *Montrose III* regarding the historical use of "other insurance" provisions also weigh against the excess

---

[9] For example, one of formulations at issue in *Montrose III* provided that " '[i]f *other valid and collectible insurance* with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance.' " (*Montrose III, supra*, 9 Cal.5th at pp. 224–225.) Several of the LMI policies at issue in this case include an identically worded provision. (See *ante*, at p. 30.) A second formulation in *Montrose III* defined the excess insurer's attachment point as the total of the liability limits set forth in the excess policy listed in the schedule of underlying insurance plus " 'the applicable limits of *any other underlying insurance collectible by the insured.*' " (*Montrose III*, at p. 224.) The First State policy at issue in this case likewise defines the attachment point as the total of the liability limit set forth in the primary policy listed in the schedule of underlying insurance plus "*the applicable limits of any other underlying insurance collectible by the insured.*" (See *ante*, at pp. 30–31.)

insurers' contention that such language is most reasonably interpreted as requiring the insured to exhaust primary insurance that was issued during precedent or successive policy periods of a continuous injury. As we explained there, such provisions have historically been understood as referring only to "other insurance" that *was issued for the same policy period*, not (as the excess insurers suggest) other insurance issued "*for different policy periods.*" (*Montrose III*, *supra*, 9 Cal.5th at p. 230; see *id*. at p. 234.) Indeed, as *Montrose III* noted and we reiterate here, most jurisdictions that have addressed analogous arguments have concluded that " 'other insurance' clauses" do not mandate horizontal exhaustion nor are they otherwise relevant to policies issued during different periods of coverage. (*Id*. at pp. 232–233.) The Restatement of Liability Insurance likewise explains that " ' "other insurance" ' clauses have generally been used to address '[a]llocation questions with respect to overlapping *concurrent policies*.' " (*Montrose III,* at p. 232, quoting Rest., Liability Insurance, § 40, com. c, p. 345.) The excess insurers have presented no argument as to why the historical understanding of "other insurance" clauses, which is generally supportive of vertical rather than horizontal exhaustion, is inapplicable when the excess policy sits over a primary policy.

The first-level excess policies also share the same general characteristics that we found in *Montrose III* to be "strongly suggest[ive]" of requiring only vertical, not horizontal exhaustion. (*Montrose III*, *supra*, 9 Cal.5th at p. 233.) For example, the excess policies "include or reference schedules of underlying insurance — all for the same policy period." (*Id*. at p. 234.) Indeed, every single policy at issue in this case describes

its attachment point by directly referencing primary insurance that was issued for the same policy period. As in *Montrose III*, we believe these schedules are most reasonably construed as a "presumptively complete list of insurance coverage that must be exhausted before the excess policy may be accessed, with the 'other insurance' clauses serving as a backstop to prevent double recovery in the rare circumstance where underlying coverage changes after the excess policy is written." (*Ibid*.)[10]

Moreover, several of the policies not only refer to underlying primary insurance issued during the same policy period, but also "referenc[e] a specific dollar amount of underlying insurance in the same policy period that must be exhausted." (*Montrose III*, *supra*, 9 Cal.5th at p. 233.) Under the excess insurers' theory of horizontal exhaustion, however, this attachment would not occur until Kaiser had exhausted that amount, plus the limits of every other primary policy it had obtained for every relevant policy period.

Furthermore, the same practical concerns with administering a rule of horizontal exhaustion that we discussed in *Montrose III* are likewise implicated here. We explained, for example, that applying horizontal exhaustion would be "far from straightforward" given that the attachment points of the insured's layers of excess insurance did not align from policy year to policy year. (*Montrose III*, *supra*, 9 Cal.5th at p. 234.)

---

[10]    The first-level excess policies also include provisions stating that upon exhaustion of those scheduled underlying policies, the excess policy shall "continue in force as underlying insurance." Again, these express references to the directly underlying primary policies tend to support a view of vertical, rather than horizontal exhaustion.

The Court of Appeal concluded this rationale was inapplicable in the current context because "there is only one underlying layer of insurance, namely, primary insurance and it is easy to ascertain whether that insurance has been exhausted." That reasoning, however, overlooks that the plain text of the first-level excess policies' "other insurance" provisions is *not* limited to other underlying *primary* insurance. Rather, the provisions speak generally to "*any other* insurance" or "*any other underlying* insurance." (Italics added.) If the excess insurers are correct that these provisions were intended to apply to insurance purchased for different policy periods, their plain language indicates that Kaiser would have to exhaust *any other underlying insurance* — i.e., any policy with a lower attachment point — not merely any other underlying primary insurance.

While that might not create any particular administrative complications if the attachment points of Kaiser's first-level excess policies were standardized across policy years, the record shows that is not the case. Rather, as in *Montrose III*, the first-level excess policies appear to come in different "shapes and sizes." (*Montrose III*, *supra*, 9 Cal.5th at p. 234.) For example, in the 1983 policy year, Kaiser obtained primary insurance for the first $2 million of liability and obtained a first-level excess policy that attaches above that amount. In 1958, however, Kaiser obtained only $1 million in primary insurance with a first-level excess policy for the next $2 million. If the "other insurance" provisions truly apply across all policy periods, does Kaiser's 1983 first-level excess policy (with an attachment point of $2 million) require Kaiser to exhaust the 1958 primary policy (with an attachment point of $1 million) *and* the first $1 million of the 1958 first-level excess policy? Or can Kaiser access the

1983 first-level excess policy as soon as the $1 million 1958 primary policy is exhausted?  Stated more simply, if the $1 million 1958 primary policy qualifies as "other underlying insurance" to the 1983 first-level excess policy, why wouldn't the initial $1 million of the 1958 first-level excess policy likewise qualify as underlying insurance that would have to be exhausted prior to accessing the 1983 policy?  As noted in *Montrose III*, "[t]he policies' silence on these basic, foundational questions tends to undermine the idea the parties expected . . . a rule [of horizontal exhaustion] to apply."  (*Id.* at p. 235.)

Finally, *Montrose III* expressed concern that "because the exclusions, terms, and conditions may vary from one [excess] policy to another" (*Montrose III*, *supra*, 9 Cal.5th at p. 235), a rule of horizontal exhaustion would "put the insured to the considerable expense of establishing a right to coverage under the definitions, terms, conditions, and exclusions from policies in every policy period triggered by the continuous injury" (*ibid*.). Again, neither the Court of Appeal nor the excess insurers have provided any explanation as to why those concerns are inapplicable in the context of primary insurance.  During the relevant time frame Kaiser bought dozens of primary policies from multiple insurers.  While the parties have not provided detailed information regarding the specific terms of those policies, the excess insurers' own briefing indicates that the terms of the primary policies vary with respect to coverage amounts, aggregate limits, allocation of defense costs and deductible requirements. Moreover, as discussed above, Kaiser, Truck and the excess insurers previously spent *years* litigating whether a specific provision in Truck's 1974 policy barred Kaiser from accessing any of Truck's other 18 primary policies (a

provision apparently absent in the non-Truck primary policies). Thus, based on the limited record before us, it is reasonable to assume that the same concerns regarding the amount of litigation a rule of horizontal exhaustion would create due to variations in policy terms and conditions are equally present in the context of primary insurance.[11]

Despite the textual overlap between the policy language at issue here and in *Montrose III*, and the similar practical complications that a rule of horizontal exhaustion would present to the insured in the context of primary insurance, the Court of Appeal concluded that "other insurance" provisions should nonetheless be assigned a different meaning when the excess policy sits over primary insurance. The sole reason the court provided in support of this conclusion was the "qualitative[]" distinctions between primary and excess insurance. As explained by the court, primary policies receive higher premiums because they "attach as first-dollar coverage and have an immediate obligation to respond," whereas excess policies may never be called upon to indemnify. Moreover, primary insurers generally have the right to control defense and settlement without input from excess insurers and "do not use

---

[11]     Although Kaiser has joined the excess insurers in arguing that Truck's contribution claim should be denied on unfairness grounds, it has notably declined to take a position as to whether the Court of Appeal properly interpreted the first-level excess policies as requiring horizontal exhaustion. In the prior *Kaiser Cement* appeal, however, Kaiser specifically argued *against* such a rule, contending that it was "objectively reasonable" to expect that its 1974 first-level excess policy would become available immediately upon exhaustion of the underlying 1974 Truck primary policy.

defense costs to reduce limits." The court provided no further discussion or explanation as to why it believed these distinctions warranted a departure from the interpretation of "other insurance" provisions that we adopted in *Montrose III*. We find the Court of Appeal's reasoning unavailing.

In *SantaFe*, *supra*, 52 Cal.App.5th 19, the First District reached a contrary conclusion, reasoning that the distinctions between primary insurance and excess insurance "provide little justification for construing the policy language interpreted in *Montrose III* differently." (*Id*. at p. 28.) Regarding the differences in the premiums paid for primary and excess insurance, the court explained that "the evaluation of risk based on the assumption of vertical exhaustion is straightforward and can be made based on known parameters. However, if the risk assessment were to be made based on the assumption of horizontal exhaustion, the evaluation would be speculative and unpredictable" as the "level of liability at which the excess coverage would attach would be unascertainable. . . . The difference between premiums paid for excess and for primary policies does not justify an interpretation that renders the point of attachment so unpredictable and unascertainable when the policy is issued." (*Id*. at p. 29.)

Regarding "the differing defense obligations" between primary and excess insurance (*SantaFe*, *supra*, 52 Cal.App.5th at p. 29), the court explained that requiring the insured to exhaust only the directly underlying primary policy does not alter the "well settled [rule] that an excess insurer [generally] has no duty to defend unless the underlying primary insurance is exhausted" (*ibid*.). The court noted that "[f]rom the perspective of the insured, one would reasonably expect the

excess insurer to contribute to the defense once the scheduled primary policies have been exhausted and the attachment points reached." (*Ibid.*)[12]

We believe that *SantaFe* has the better view. We are not persuaded that the differences in characteristics between primary and excess insurance is sufficient to demonstrate that "other insurance" provisions are meant to require horizontal exhaustion when used in first-level excess policies. As noted, *Montrose III* concluded that identical language appearing in higher-level excess policies is most reasonably construed as applying only to underlying insurance that covers the same policy period. We do not believe that the meaning of the language is transformed to say exactly what we concluded it did not say in *Montrose III* merely because the policy sits over primary insurance rather than another level of excess insurance.

Furthermore, as *SantaFe* explained, even under the rule of vertical exhaustion that we adopted in *Montrose III*, the differences in premiums between primary and excess insurance continue to reflect the fact that the excess insurer still has no indemnity obligations unless and until the insured exhausts the limits of the directly underlying primary policy. Given that these excess policies were written long before we adopted the all-sums-with-stacking approach to continuous injuries (see *ante*, at pp. 7–9), we are dubious that the excess insurers priced

---

[12]   The specific defense obligations that a first-level excess insurer owes to the insured, and whether defense costs are included in the aggregate limits of the excess policy, will of course turn on the specific terms of each excess policy.

their premiums on the assumption that their policies would not attach until the insured had exhausted the directly underlying primary policies *along with any other primary insurance the insured might acquire in later years.* Were that truly the insurers' intent, we would expect a clearer statement than a mere reference to "other insurance." (See *Montrose I*, *supra*, 10 Cal.4th at p. 647 [" 'Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage' "].) While the excess insurers may not have anticipated the coverage and allocation rules that have emerged from the *Montrose*, *Aerojet*, and *Continental* line of decisions, we cannot now rewrite what they promised to the insured.

We are also dubious that even *after* our adoption of the all-sums-with-stacking approach, excess insurers would choose to price premiums — or that the insured would agree to pay premiums — based on a horizontal exhaustion approach that carries the inherent uncertainty of what other primary insurance the insured might acquire in later years. By raising the excess policy's attachment point with each subsequent primary policy that the insured acquires during the period of continuous injury, a rule of horizontal exhaustion effectively operates to penalize the insured for obtaining *more* insurance. It is not clear why the insured would agree to such an approach. Thus, absent clear policy language to that effect, we decline to read "other insurance" language to reflect such an agreement between the insured and excess insurer.

In sum, we believe that the language of the first-level excess policies, when considered in conjunction with the insured's reasonable expectations and the historical role of

"other insurance" provisions, is most naturally read to mean that the insured may access the policies upon exhaustion of the directly underlying policies that were purchased for the same period. Excess insurers do, however, remain free to write their future excess policies in a manner that expressly requires horizontal exhaustion. (See *Montrose III*, *supra*, 9 Cal.5th at p. 237 ["Parties to insurance contracts are, of course, free to write their policies differently to establish alternative exhaustion requirements or coverage allocation rules if they so wish"].)

As noted above, *Community Redevelopment, supra*, 50 Cal.App.4th 329, which predates our decision in *Montrose III*, reached a different conclusion. The court there found that similarly worded "other insurance" provisions required the insured to horizontally exhaust all primary insurance. As noted above, in reaching that conclusion, the court relied primarily on case law that addressed *noncontinuous* injury claims (i.e., claims that triggered only one policy period). (See *ante*, at pp. 20–22; *Community Redevelopment*, at p. 339, citing *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593 [concerning an aircraft collision], *McConnell v. Underwriters at Lloyds* (1961) 56 Cal.2d 637 [concerning an automobile collision], and *Lamb v. Belt Cas. Co.* (1935) 3 Cal.App.2d 624 [concerning an automobile collision].) The courts in those cases held that the excess policies' "other insurance" provisions required the insured to exhaust not only the underlying primary insurance expressly listed in the excess policy, but also any other underlying primary insurance that the insured had obtained *for the same policy period*. (See *ante*, at p. 21.) *Community Redevelopment* concluded that "other

insurance" provisions should operate in the same manner for continuous injury claims that trigger multiple policy periods.

*Community Redevelopment*, however, failed to recognize that cases construing "other insurance" provisions in the context of noncontinuous injuries do not speak to the ambiguity that we address here (which was the same ambiguity at issue in *Montrose III*):  are "other insurance" clauses most reasonably construed as applying to other underlying insurance issued *during the same policy year* or do such clauses extend to other underlying insurance issued during *different policy years* within the continuous period of injury?  Because cases addressing noncontinuous injury claims do not speak to this ambiguity, *Community Redevelopment* erred in relying on them.[13]

For the reasons explained above, we disapprove *Community Redevelopment*'s conclusion that standardized "other insurance" provisions appearing in first-level excess policies compel a rule of horizontal exhaustion.  We likewise disapprove language in *Padilla Construction Co., Inc. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984 and

---

[13]  In addition to finding that the "other insurance" provisions compelled a rule of horizontal exhaustion, the *Community Redevelopment* court believed that "a horizontal exhaustion rule . . . is most consistent with the [all-sums] principles enunciated in *Montrose* [*I, supra,* 10 Cal.4th 645]."  (*Community Redevelopment, supra,* 50 Cal.App.4th at p. 340.) However, we rejected an essentially identical argument in *Montrose III*.  (See *Montrose III, supra,* 9 Cal.5th at pp. 235–236 [rejecting insurers' assertion that a "rule of horizontal exhaustion is logically compelled by our adoption of an all-sums-with-stacking approach to liability for long-tail injuries"; "There is no evident inconsistency between an all sums approach and [vertical exhaustion]"].)

*Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996)
46 Cal.App.4th 1810, suggesting that California law generally
requires horizontal exhaustion of all primary insurance in cases
of continuous loss. (See *Padilla*, at pp. 986–987; *Stonewall*, at
pp. 1852–1853.)

### 2. *Additional considerations regarding Truck's contribution claim*

*Montrose III* was a coverage action that required us to
determine whether the insured was permitted to access its
higher-level excess policies. The answer to that question
depended entirely on our interpretation of the policies at issue
in that case. Here, however, we are faced with an equitable
contribution claim between insurers. As noted above, the terms
of the insurers' policies comprise only one of the factors courts
may consider when evaluating whether contribution would
" 'accomplish ultimate justice' " (*Signal*, *supra*, 27 Cal.3d at
p. 369) in a particular case (see *ibid.*; *ante*, at pp. 17–18). Thus,
the fact that we have rejected the Court of Appeal's conclusion
that the excess policies do not create any indemnity obligation
until all primary insurance has been exhausted, and instead
have interpreted those policies in a manner that would permit
the insured (Kaiser) to access the policies upon exhaustion of the
directly underlying primary policies, does not resolve whether
Truck is entitled to *contribution from the excess insurers*.

To that end, the excess insurers and Kaiser argue that
even if, as a matter of contract interpretation, the policies are
most reasonably construed as allowing the insured (Kaiser) to
access the first-level excess policies upon exhaustion of the
directly underlying primary insurance, it would nonetheless
remain unfair as a matter of *equity* to ever order an excess

insurer to contribute to a primary insurer given the distinct role those two types of carriers play in covering a loss. Although we have concluded that the qualitative distinctions between primary and excess insurance do not present a sufficient basis to depart from the interpretation of the "other insurance" provisions that we adopted in *Montrose III* (i.e., that such provisions impose only a rule of vertical exhaustion on the insured), whether those distinctions might have more salience in the context of equitable contribution between insurers remains an open question. (See generally *Dart*, *supra*, 28 Cal.4th at p. 1080 ["the obligation of successive primary insurers to cover a continuously manifesting injury is a separate issue from the obligations of the insurers to each other"]; *SantaFe*, *supra*, 52 Cal.App.5th at p. 29 [whether a policy requires horizontal or vertical exhaustion presents "a different question" than determining "the rights of . . . carriers . . . to contribution"].)

The excess insurers and Kaiser further argue that even if there might be some circumstances where it would be appropriate to order contribution between primary and excess insurers, such an order would be unjust under the facts presented in this case. They explain that because Truck agreed to indemnify Kaiser up to $500,000 for each asbestos-related bodily injury claim but placed no aggregate limit on coverage (something no other primary insurer did), ordering the excess insurers to contribute to that initial $500,000 in coverage would effectively allow Truck to pay less coverage than it promised under its 1974 policy. They further contend that ordering contribution would simultaneously leave Kaiser (and asbestos claimants) with less overall coverage by prematurely exhausting

excess insurance that could otherwise be used to cover individual asbestos claims that exceed Truck's $500,000 per occurrence limit or claims that do not trigger Truck's 1974 policy (i.e., claims in which initial exposure occurred after the 1974 policy period). In support of these arguments, Kaiser and the excess insurers cite expert testimony and other evidence regarding claims allocation that was presented during the bench trial.

Because the Court of Appeal denied contribution based solely on its erroneous interpretation of the first-level excess policies, it did not consider these or any other alternative arguments related to the question of contribution. Having now clarified that the first-level excess insurers' indemnity obligations to Kaiser attach upon exhaustion of the directly underlying primary policies, we find it appropriate to remand the matter for the court to reevaluate whether contribution would " 'accomplish ultimate justice' " (*Signal, supra*, 27 Cal.3d at p. 369) among the insurers and their policy holder. (See, e.g., *Coast Community College Dist. v. Commission on State Mandates* (2022) 13 Cal.5th 800, 822 [remanding to allow the court to " 'resolve [unexamined issues] . . . in the first instance' "]; *Hamilton, supra*, 22 Cal.4th at p. 1149 ["It is appropriate to remand for the Court of Appeal to resolve . . . in the first instance" issues that the court chose "not [to] reach because of its holdings"].)

On remand, the parties are free to raise any arguments they believe may aid the court in deciding whether contribution is ever appropriate between primary and excess insurers and, if so, whether contribution would be appropriate under the circumstances of this case. The Court of Appeal, in turn, retains

discretion to make a further remand to the trial court if it concludes that the trial court is better positioned to address any questions of contribution that may arise in the further proceedings.[14]

## III. DISPOSITION

The Court of Appeal's judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

---

[14] Like the Court of Appeal, the trial court's decision to deny contribution was predicated exclusively on its finding that the excess policies required horizontal exhaustion. (See *ante*, at pp. 14–15.) As a result, the trial court did not address any of the parties' other arguments regarding contribution, much of which was presented through expert testimony at trial. Thus, to the extent the Court of Appeal concludes that Truck is potentially eligible for contribution, it may further conclude that the trial court is in a better position to weigh the equities at stake given its familiarity with the parties and their relative positions in this long-running litigation. (See *Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 724 ["In evaluating competing claims for equitable contribution, the trial court exercises its discretion to weigh the equities to ' " 'accomplish ultimate justice' " ' "]; *Axis*, *supra*, 204 Cal.App.4th at p. 1228 ["in an equitable contribution action, a court reviews the applicable facts and policies and decides what is fair between the potential coinsurers"].) We leave those determinations to the Court of Appeal.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Truck Insurance Exchange v. Kaiser Cement and Gypsum Corp.

---

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 1/7/22 – 2d Dist., Div. 4
**Rehearing Granted**

---

**Opinion No.** S273179
**Date Filed:**  June 17, 2024

---

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Kenneth R. Freeman

---

**Counsel:**

Pia Anderson Moss Hoyt, Scott R. Hoyt, Adam L. Hoyt; Greines, Martin, Stein & Richland, Robert A. Olson, Jonathan H. Eisenman and Edward L. Xanders for Plaintiff and Appellant.

The Cook Law Firm, Philip E. Cook and Brian J. Wright for Defendant, Cross-complainant and Appellant Kaiser Cement and Gypsum Corporation.

Covington & Burling, David B. Goodwin, Breanna K. Jones and Billie T.H. Mandelbaum for United Policyholders as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant Kaiser Cement and Gypsum Corporation.

Morgan, Lewis & Bockius and Jeffrey S. Raskin for Santa Fe Braun, Inc., as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Duane Morris, Brian A. Kelly, Paul J. Killion and Kathryn T.K. Schultz for Defendant and Appellant.

Lynberg & Watkins, Sinnott, Puebla, Campagne & Curet and Wendy E. Schultz for Cross-defendant and Appellant and Defendant and Respondent.

Squire Patton Boggs, G. David Godwin and Tania L. Rice for Defendant and Respondent The Continental Insurance Company.

Selman Breitman, Elizabeth M. Brockman and Calvin S. Whang for Defendants and Respondents National Casualty Company and Sentry Insurance a Mutual Company.

Crowell & Moring, Mark D. Plevin and Christine E. Cwiertny for Defendants and Respondents Fireman's Fund Insurance Company and Allianz Underwriters Insurance Company.

Kendall Brill & Kelly, Alan Jay Weil; Shipman & Goodwin, Ruggeri Parks Weinberg, James P. Ruggeri, Katherine M. Hance and Edward B. Parks II for Defendant and Respondent First State Insurance Company.

Aiwasian & Associates and Deborah A. Aiwasian for Defendant and Respondent Westchester Fire Insurance Company.

Davis Wright Tremaine, Everett W. Jack, Jr., and Lawrence B. Burke for Defendant and Respondent Transport Insurance Company.

Traub Lieberman Straus & Shrewsberry, Robert Dennison, Kevin P. McNamara, Giuseppe Castaldi and Laura Siegel-Puhala for Defendant and Respondent Evanston Insurance Company.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert A. Olson
Greines, Martin, Stein & Richland LLP
6420 Wilshire Boulevard, Suite 1100
Los Angeles, CA 90048
(310) 859-7811

Brian A. Kelly
Duane Morris LLP
Spear Tower, One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
(415) 957-3213

Philip E. Cook
The Cook Law Firm, P.C.
601 S. Figueroa Boulevard, Suite 2050
Los Angeles, CA 90017
(213) 988-6100